**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARK ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-944 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| DR. CATHERINE LARRY et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Mark Anderson, an inmate at Illinois River Correctional Center, has brought suit against a number of defendants, including Defendant Tiffanie Clark, the day-to-day warden at Illinois River, alleging claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983. Presently before us is Anderson's motion for a preliminary injunction, as amended. (*See* Dkt. No. 42, Pl.'s Mot. for Prelim. Inj. ("Mot."); Dkt. No. 43, Pl.'s Mem. of Law in Supp. of Mot. ("Mem."); Dkt. No. 52-1, Pl.'s Am. Mot. for Prelim. Inj. ("Am. Mot.").)[1] Clark opposes Anderson's motion. (Dkt. No. 57, Clark's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Opp'n").) We grant Anderson's motion for a preliminary injunction as stated herein.

**FACTUAL BACKGROUND**

We take the following facts from the operative Second Amended Complaint, Anderson's and Clark's submissions in connection with the pending motion, and other relevant filings from this case's docket. *See Martinez v. City of Chicago*, --- F. Supp. 3d ----, 2021 WL 1402138, at

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

*1 & n.2 (N.D. Ill. Apr. 14, 2021) (taking factual background from similar documents to rule on the plaintiff's motion for a temporary restraining order and preliminary injunction). We have made "factual determinations on the basis of a fair interpretation of the evidence before" us, but "these findings are preliminary and do not bind [us] as the case progresses." *Id.* at *1 (quotation marks omitted).

Anderson is a prisoner in the custody of the Illinois Department of Corrections ("IDOC"). (Dkt. No. 45, 7/31/21 Decl. of Mark Anderson ("Anderson Decl."), ¶ 2; Dkt. No. 61, Second Am. Compl. ("SAC"), ¶ 7.) He observes Judaism, including kosher dietary law, and has done so since he was a child. (Anderson Decl. ¶¶ 3, 4.) Since being incarcerated in 2003, Anderson has "sought and been admitted to the kosher meal program of each IDOC facility" where he has been housed. (*Id.* ¶¶ 2, 5.)

From 2003 to 2017, IDOC provided Anderson with various brands of pre-packaged kosher meals: Spring Valley, My Own Meal Inc., and Meal Mart "frozen" brands. (*Id.* ¶ 6.) Anderson ate these meals without incident. (*Id.*) But in mid-2017, Pinckneyville Correctional Center, where Anderson was housed at the time, began serving Meal Mart "shelf-stable" brand ready-to-eat meals as the entrée portion of its kosher lunch and dinner meals. (*Id.* ¶ 7; SAC ¶¶ 24, 25.) After eating one of these meals, Anderson experienced nausea and tingling in his throat and tongue. (Anderson Decl. ¶ 8.) Anderson suspected this was an allergic reaction to the Meal Mart shelf-stable meal, and he reported his symptoms to Pinckneyville's staff. (*Id.* ¶¶ 8, 9.) For some time thereafter, Anderson received a substitute prepared kosher meal, to which he did not suffer a similar reaction when eating. (*Id.* ¶ 9.) After supplies of the substitute meal were exhausted, however, Pinckneyville stopped providing it to Anderson. (*Id.* ¶ 10.) Anderson was subsequently forced to either eat the Meal Mart shelf-stable meals again—which he did a handful

of times because he continued to experience physical reactions to the meals—or supplement his diet with purchases from Pinckneyville's commissary when he could. (*Id.*; SAC ¶¶ 28–30.)

In December 2017, IDOC transferred Anderson from Pinckneyville to Joliet Treatment Center ("JTC"). (Anderson Decl. ¶ 11.) Upon arriving at JTC, Anderson immediately requested to be put on the kosher meal plan, but he was erroneously informed that JTC did not offer such a plan. (SAC ¶ 32.) After Anderson discovered that JTC did offer a kosher meal program, he again requested admission. (*Id.*) He was admitted to the program, but not until October 2018. (*Id.* ¶¶ 32, 34.)

At this time, the kosher meals JTC regularly provided for lunch and dinner were the Meal Mart shelf-stable meals.[2] (*Id.* ¶¶ 35, 45.) Over the course of October 2018, Anderson ate these meals on multiple occasions, hoping that he would not experience the same physical reactions he suffered at Pinckneyville when he ate the meals (nausea and tingling in his throat and tongue). (*Id.* ¶¶ 26, 36; Anderson Decl. ¶¶ 7, 8, 11, 12.) Each time, however, Anderson experienced similar physical reactions, as well as a reddened and swollen tongue and cheek, tightness in his throat, and difficulty swallowing. (SAC ¶¶ 36, 37; Anderson Decl. ¶ 13.) In each instance, Anderson requested medical assistance and was referred to JTC's infirmary, but by the time he was transferred to the infirmary—a process that often took at least 45 minutes—his symptoms had abated. (SAC ¶ 38; Anderson Decl. ¶¶ 14–17.) JTC's medical records reflect that at several visits to sick call or the health care unit in October 2018, Anderson reported experiencing physical reactions after eating the Meal Mart shelf-stable meals. (*E.g.*, Dkt. No. 62-1 at 1–2 (10/4/18 note indicating that Anderson complained of nausea and abdominal pain two to three

[2] At times, JTC has served other brands of pre-packaged kosher meals, including the Spring Valley and Meal Mart frozen brands. (Anderson Decl. ¶¶ 18, 23.) Anderson has eaten these meals without experiencing a physical reaction. (*Id.*)

days after starting kosher diet); *id.* at 3–5 (10/8/18 notes indicating that Anderson complained of

nausea, vomiting, and difficulty swallowing after eating kosher meals); *id.* at 4 (10/9/18 note

indicating that Anderson complained of an upset stomach, tight throat, and difficulty swallowing

after eating kosher meals); *id.* at 6–7 (10/24/18 note indicating that Anderson reported nausea

when eating kosher meals); *id.* at 7–8 (10/25/18 notes indicating that Anderson reported that his

throat swells and closes off when he eats kosher meals); *id.* at 9 (10/26/18 note indicating that

Anderson reported it became hard to swallow after eating the kosher meal at lunch).)

　　　In mid-October, Anderson filed a grievance in which he informed JTC of his suspected

allergic reactions to the Meal Mart shelf-stable meals and his inability to eat these meals. (SAC

¶ 39.) He asserted that he was not receiving an adequately nutritional diet, and he requested an

alternative meal. (*Id.*) Later that month, he relayed the same information to Defendant Kathryn

Buckley, JTC's Food Service Program Manager, who was responsible for the operation of JTC's

kosher meal program. (*Id.* ¶¶ 12, 40.) Nonetheless, JTC did not provide Anderson with another

brand of kosher meal or additional food. (*Id.* ¶ 44.) To avoid the painful physical reactions that

occurred when he ate the Meal Mart shelf-stable meals, which constituted most of the food

provided for lunch and dinner, Anderson "subsist[ed] solely on the remaining food items

provided to him as part of JTC's kosher diet": dry cereal, lettuce, bread (or crackers), peanut

butter, jelly, and fruit. (*Id.* ¶¶ 45, 47, 48.)

　　　On December 5 and 6, Anderson again ate the Meal Mart shelf-stable meals. (*Id.* ¶ 51.)

He experienced a swollen tongue and difficulty swallowing and breathing, and he was taken to

JTC's infirmary, where his symptoms were recorded. (*Id.*) That month, Anderson was referred

to Defendant Dr. Kul Sood. (*Id.* ¶¶ 15, 52.) Dr. Sood is a physician employed by Defendant

Wexford Health Sources, Inc. ("Wexford"), which contracts with IDOC to provide medical care

and treatment to IDOC's inmates. (*Id.* ¶¶ 14, 15.) Anderson informed Dr. Sood of his history of reactions to the Meal Mart shelf-stable meals. (*Id.* ¶ 53.) Dr. Sood responded by telling Anderson that if he felt he was allergic to these meals, he should stop eating them. (*Id.* ¶ 54.)

In February 2019, Anderson contacted a religious affinity organization asking for help in obtaining "a nutritionally sufficient and religiously compliant meal." (*Id.* ¶ 55.) A rabbi affiliated with the organization subsequently wrote to JTC's warden, asking "whether Anderson was receiving adequate nutrition that was compliant with his religious beliefs." (*Id.* ¶ 56.) Around the same time, JTC received a shipment of Meal Mart frozen kosher meals, which it provided to Anderson. (Anderson Decl. ¶ 23.) When eating these meals, Anderson did not suffer the same reactions as when he ate the shelf-stable meals, but once the shipment had been consumed, he did not receive any more Meal Mart frozen meals. (*Id.*)

Then, in April 2019, Anderson began receiving one serving of tuna fish with lunch. (*Id.* ¶ 24.) He was told that the tuna fish was provided to address his "apparent problem" with the shelf-stable meals. (SAC ¶ 59.) For the remainder of his time at JTC (approximately two years), Anderson's daily diet generally consisted of the following: dry cereal, bread (or crackers), peanut butter, jelly, and one piece of fruit for breakfast; lettuce, bread (or crackers), one serving of tuna fish, and one piece of fruit for lunch; and lettuce, bread (or crackers), and one piece of fruit for dinner. (*Id.* ¶ 60.) He supplemented his diet by purchasing commissary items with his personal funds, but "given the expense of these items, as well as the relative scarcity of kosher items at the prison's [c]ommissary," he could not "maintain his daily caloric intake at appropriate levels." (*Id.* ¶¶ 97, 98.) As a result, Anderson lost significant weight and has experienced fatigue, numbness in his right leg, anger, and mood swings since mid-2019. (*Id.* ¶¶ 94–96.) Anderson also ate the Meal Mart shelf-stable meals again on two occasions in December 2020 and January

2021, hoping that his suspected allergy had abated and he could enjoy a fully nutritional meal. (*Id.* ¶ 87.) Both times, however, Anderson experienced a severe physical reaction that included wheezing, difficulty breathing, and a severely swollen tongue. (*Id.* ¶¶ 88–90.)

While at JTC, Anderson was informed that to receive an alternative kosher meal or other modifications to his meal, he needed an allergy documented by diagnostic testing, which he did not have. (*Id.* ¶¶ 62, 63; Anderson Decl. ¶ 21.) Anderson repeatedly asked IDOC authorities for an allergy test, but it was not until September 2019 that Dr. Sood requested that Anderson undergo allergy testing to determine whether he was allergic to the kosher meals. (Anderson Decl. ¶ 22; SAC ¶ 72; Dkt. No. 62-2 at 1, 4.) Wexford, however, denied Dr. Sood's request.[3] (SAC ¶ 73; Dkt. No. 62-2 at 2, 4; Dkt. No. 62-3 at 2.) Although Wexford acknowledged that Anderson's records dating from 2018 stated symptoms including difficulty swallowing, vomiting, and pain, it denied the request for allergy testing because it believed Anderson had eaten non-kosher foods from the prison commissary and had lost weight as a result of a weight-loss program, as opposed to inadequate nutrition. (SAC ¶¶ 74–76; Dkt. No. 62-2 at 2.)

On or about April 5, 2021, IDOC transferred Anderson from JTC to Illinois River. (Anderson Decl. ¶ 25.) Like JTC, Illinois River serves the Meal Mart shelf-stable meals for the lunch and dinner meals of its kosher meal program. (SAC ¶ 102.) As soon as he arrived at Illinois River, Anderson requested placement in the kosher meal program. (Anderson Decl. ¶ 26.) He was enrolled in the program on April 6. (SAC ¶ 100.)

Upon arriving at Illinois River, Anderson completed a medical intake form in which he "informed the nurse of [his] suspected allergy to the Meal Mart 'shelf stable' meals, [his] history

---

[3] It appears that Wexford must approve a medical professional's request for an inmate to undergo allergy testing. (*See* SAC ¶¶ 74, 78.)

of suspected allergic reactions, and [his] inability to eat the meal as part of [his] kosher diet."
(Anderson Decl. ¶ 27.) Anderson also wrote a letter to Tracy Bordner, Illinois River's Assistant
Warden for Operations, describing his suspected allergy to the Meal Mart shelf-stable meals and
his inability to eat the meals and asking if there was "anything you can do to help get the kosher
diet modified so I may eat." (*Id.* ¶¶ 28, 29; SAC ¶ 103; Dkt. No. 45-1 at 3.) And a couple days
later, Anderson spoke with Cherryle Hinthorne, Illinois River's warden at the time, and informed
her of his "suspected allergy to the Meal Mart 'shelf stable' meals, [his] history of suspected
allergic reactions, [his] inability to eat the meal as part of [his] kosher diet, and IDOC's
assertions that [he] would not be provided an accommodation without a documented allergy in
[his] medical file." (Anderson Decl. ¶ 28; SAC ¶ 105.) Even so, Anderson was not provided
with an alternative kosher meal. (SAC ¶ 106.)

On April 12, Anderson again tried eating a Meal Mart shelf-stable meal, hoping that his
suspected allergic reaction to the food had lessened. (*Id.* ¶ 107.) It had not; "[i]mmediately upon
eating the meal, Anderson experienced distress and requested help, after which jail staff called a
'Code 3.'" (*Id.* ¶ 108.) Anderson was transported to the healthcare unit, where medical
personnel assessed and monitored him until his symptoms had abated. (*Id.*) Anderson then
"informed the medical personnel of his reactions to the Meal Mart 'shelf-stable' meal, the
development and worsening of his symptoms, and the lack of an adequately nutritional diet as a
result." (*Id.* ¶ 109.) The medical personnel prescribed Claritin and told Anderson to avoid
eating foods to which he suspected he was allergic. (*Id.* ¶ 110; Dkt. No. 62-1 at 15–16 (4/12/21
outpatient progress note).)

On April 18, Anderson wrote a letter to Brian Peters, Illinois River's Food Service
Program Manager, in which he informed Peters of his suspected allergy to the Meal Mart shelf-

stable meals and his recent attempt to eat one of these meals; explained how, due to his allergy, he could only eat lettuce, fruit, and matzoh for lunch and dinner; and asked if any modifications could be made to his kosher meals. (SAC ¶ 111; Anderson Decl. ¶ 40(c); Dkt. No. 45-4 at 3.) Peters responded a few days later, stating that he had contacted Illinois River's Health Care Unit, but the Health Care Unit said that Anderson had no known allergies on file. (SAC ¶ 112; Dkt. No. 45-4 at 2.)

On April 29, Anderson asked the duty nurse on sick call why Peters had said that Anderson had no known allergies to the Meal Mart shelf-stable meals and why Peters was unaware that Anderson "was not being provided with a nutritionally sufficient diet." (SAC ¶ 113.) The nurse told Anderson to contact Defendant Jennifer Meaker, Illinois River's Health Care Unit Administrator. (*Id.* ¶¶ 20, 114.) On May 2, Anderson sent an inmate request form to Meaker. (*Id.* ¶ 115.) In the form, Anderson "explained his history of suspected allergic reactions to the Meal Mart 'shelf-stable' meals and that he had been informed by medical personnel not to consume the meals." (*Id.*) Anderson also asked "why, if he had been informed not to eat the meals, an allergy had not been documented in his file so as to alert the dietary program to provide him with an alternative, nutritionally sufficient diet." (*Id.*) As of September 16, 2021, Meaker had not responded to Anderson. (*Id.* ¶ 116.)

Anderson alleges, upon information and belief, that Clark became Illinois River's day-to-day warden in late April or early May 2021. (*Id.* ¶ 117.) In this position, Clark is responsible for all of Illinois River's operations, including medical services and the Food Service Program. (*Id.* ¶ 19.) Anderson further alleges, upon information and belief, that Clark "is or should be aware of Anderson's suspected allergy to the Meal Mart 'shelf-stable' meals, his suspected allergic reaction to eating those meals," and Illinois River's failure to provide Anderson with a

nutritionally sufficient diet.  (*Id.* ¶ 118.)  According to Anderson, Clark has or should have this awareness based on Anderson's prior communications with Hinthorne, Bordner, Peters, and Meaker.  (*Id.*)

Since arriving at Illinois River, Anderson has lost approximately 20 pounds.  (Anderson Decl. ¶ 38.)  Because he cannot eat the Meal Mart shelf-stable meals, his diet consists "almost entirely of the side dishes served as part of the kosher meal program."  (*Id.* ¶ 31.)  This means a daily diet of dry cereal, bread (or matzoh), peanut butter, jelly, and one piece of fruit for breakfast; lettuce, bread (or matzoh), and one piece of fruit for lunch; and lettuce, bread (or matzoh), and one piece of fruit for dinner.  (*Id.* ¶ 32.)  Illinois River also supplemented Anderson's meals with one serving of tuna fish on five occasions in July 2021.  (*Id.* ¶ 33.)

The only means by which inmates can obtain food "other than that provided through [Illinois River's] meal programs" is by purchasing food from the prison's commissary.  (SAC ¶ 122.)  Until early June 2021, Anderson could not buy anything from Illinois River's commissary because of a separate disciplinary issue.  (Anderson Decl. ¶ 34.)  From early June through early August, Anderson was permitted to buy goods from the commissary, but he could visit the commissary only once per month and only spend up to $30.  (*Id.*)  The $30-limit applied to the purchase of both food and other necessities (such as soap and personal hygiene products), so Anderson's ability to supplement his diet by purchasing food from the commissary is "extremely limited and insufficient to provide a balanced diet."  (*Id.* ¶ 35.)  Consequently, Anderson has eaten a Meal Mart shelf-stable meal on two occasions during his time at Illinois River due to hunger.  (*Id.* ¶ 36.)  Each time, he suffered the same physical reactions that he suffered when eating the meals before.  (*Id.* ¶ 37.)

On August 24, 2021, a medical professional referred Anderson for allergy testing related to this case. (Opp'n at 3; Dkt. No. 57-1.) Wexford approved the referral, and on October 4, Clark represented that Anderson was scheduled to meet with an allergist "in the next few weeks." (Dkt. No. 64-1 at 2.)

**PROCEDURAL BACKGROUND**

On February 18, 2021, Anderson initiated this lawsuit by filing a *pro se* Complaint. (Dkt. No. 1.) We screened the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A(a) and allowed Anderson to proceed with certain claims. (Dkt. No. 8.) We also recruited counsel for Anderson. (*Id.* at 1.) On May 5, Anderson, through recruited counsel, filed an Amended Complaint. (Dkt. No. 12, Am. Compl.) The Amended Complaint asserted that Clark violated RLUIPA, Anderson's right to freely exercise his religion under the First Amendment, and his right to receive nutritionally adequate food under the Eighth Amendment. (*Id.* ¶¶ 119–43.) It also asserted that Meaker and Wexford violated Anderson's Eighth Amendment rights by being deliberately indifferent to his serious medical needs. (*Id.* ¶¶ 144–50.)

On July 29, Clark moved to dismiss Anderson's RLUIPA and First Amendment claims against her. (Dkt. No. 34, Clark's Mot. for Involuntary Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) ("Clark MTD").) Two weeks later, Anderson moved for a preliminary injunction that required (1) Wexford and Meaker "to facilitate prompt and appropriate testing of [his] suspected allergy to the Meal Mart 'shelf-stable' meal product"; and (2) Clark to provide him with a kosher diet "that satisfies basic nutritional standards" and "to which he is not allergic . . . until the results of that allergy testing can be confirmed and [his] allergy can be accommodated by IDOC." (Mot. at 3.) On September 8, Anderson moved for leave to amend his preliminary injunction motion to remove without prejudice his request for injunctive relief against Wexford and Meaker. (Dkt. No. 52, Pl.'s Mot. for Leave to File Am. Mot. for Prelim. Inj., at 3.)

Anderson shortly thereafter moved to file a Second Amended Complaint as well. (Dkt. No. 58.) We granted both motions. (Dkt. Nos. 53, 60.)

In the operative Second Amended Complaint, Anderson alleges that Clark, in her official capacity as Illinois River's warden, violated RLUIPA, Anderson's right to exercise his religion under the First Amendment, and his right to receive nutritionally adequate food under the Eighth Amendment. (SAC at 1 & ¶¶ 124–48 (Counts I, II, III).) Anderson also alleges that Meaker, in her official capacity as Illinois River's Health Care Unit Administrator, and Wexford have been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (*Id.* at 1 & ¶¶ 149–55 (Count IV).)

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy [that is] never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008). "To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). "If the plaintiff makes this showing, the court weighs the harm of denying an injunction to the plaintiff against the harm to the defendant of granting one." *Id.* "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Where appropriate, this balancing process should also include considering the public interest, i.e., "any effects that granting or denying the preliminary injunction would have on nonparties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (quotation marks omitted). "Mandatory preliminary injunctions—those requiring an affirmative act by the

defendant—are ordinarily cautiously viewed and sparingly issued." *Mays*, 974 F.3d at 818 (quotation marks omitted).

**ANALYSIS**

Anderson seeks a preliminary injunction ordering Clark to provide him with a kosher diet "that satisfies basic nutritional standards" and "to which he is not allergic . . . until the results of allergy testing can be confirmed and [his] allergy can be accommodated by IDOC." (Am. Mot. at 4.) According to Anderson, such an injunction is appropriate because he is reasonably likely to succeed on the merits of his claims based on RLUIPA and the Eighth Amendment; "he has no adequate remedy at law"; "he will suffer irreparable harm absent the injunction"; the balance of harms weighs in his favor; the granting of his motion will not negatively impact the public interest; "and a preliminary injunction is the least intrusive means necessary to correct" the alleged violations. (*Id.* at 3.)

**I. Evidentiary Hearing**

We begin by briefly discussing why we have ruled on Anderson's motion without holding an evidentiary hearing. "An evidentiary hearing is required if the nonmoving party raises genuine issues of material fact in response to a motion for a preliminary injunction." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002). "[T]he party seeking the evidentiary hearing must demonstrate that it has 'and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue the injunction.'" *Id.* (quoting *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997)).

An evidentiary hearing is not necessary in the circumstances here. The nonmoving party, Clark, does not request an evidentiary hearing, nor does she specifically identify any genuine issues of fact that must be resolved before we can rule on Anderson's motion. (*See generally*

Opp'n.)  And although Clark's opposition suggests that she does not believe that Anderson suffers the reactions he claims to suffer, Clark does not direct us to any evidence that, if believed, would cast doubt on Anderson's assertions regarding these reactions.  *See Promatek*, 300 F.3d at 814.  Anderson, for his part, requests an evidentiary hearing only if we decline to enter an injunction.  (Dkt. No. 62, Pl.'s Reply in Supp. of Mot. ("Reply"), at 9.)  He further contends that he wants the opportunity to address factual assertions in Clark's opposition that are unsupported by evidence.  (*Id.*)  But the decision to hold an evidentiary hearing does not turn on whether the requesting party would otherwise lose the preliminary injunction motion; it turns on whether genuine issues of material fact exist.  *See Promatek*, 300 F.3d at 814.  Moreover, Anderson does not identify the factual assertions he wants to address or explain why he could not have addressed these assertions in his Reply.  (*See* Reply at 9.)

As such, we proceed to decide whether to grant or deny Anderson's request for a preliminary injunction based on the filings before us.

## II.    Preliminary Injunction Analysis

Anderson originally moved for a preliminary injunction against Clark, Meaker, and Wexford based on his RLUIPA claim (Count I), his Eighth Amendment claim based on inadequate provision of food (Count III), and his Eighth Amendment claim based on deliberate indifference to his serious medical needs (Count IV).  (Mot. at 1–2; Mem. at 7–13.)  Anderson later amended his motion to withdraw his request for injunctive relief against Wexford and Meaker.  (Pl.'s Mot. for Leave to File Am. Mot. for Prelim. Inj. at 3.)  Because Anderson's deliberate indifference to medical needs claim was the basis for his now-withdrawn request against Wexford and Meaker (this is the only claim he asserts against these two defendants), and because Anderson does not assert this claim against Clark, we do not consider it in our analysis.

We consider only Anderson's RLUIPA claim and inadequate provision of food claim against Clark.

**A. Likelihood of Success on the Merits**

To meet the likelihood-of-success requirement, "a plaintiff must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 974 F.3d at 822 (citation omitted). "What amounts to 'some' depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach," but it unquestionably requires more than a "better than negligible" chance or a "mere possibility" of success and less than "proof by a preponderance." *Id.*; *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). Success on this element "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Ill. Republican Party*, 973 F.3d at 762–63.

**1. RLUIPA**

In Count I, Anderson contends that Clark has violated RLUIPA by failing to provide him with kosher meals that he can safely eat. (*See* SAC ¶¶ 128–33; Mem. at 7–10.) RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721, 125 S. Ct. 2113, 2122 (2005). To that end, RLUIPA prohibits a state prison "from taking any action that substantially burdens the religious exercise of an institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest." *Holt v. Hobbs*, 574 U.S. 352, 356, 135 S. Ct. 853, 859 (2015); *Jones v. Carter*, 915 F.3d 1147, 1148–49 (7th Cir. 2019). "In establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion." *Koger v. Bryan*, 523 F.3d 789, 796 (7th

Cir. 2008). If "the plaintiff establishes this prima facie case," the defendant must demonstrate that its "practice is the least restrictive means of furthering a compelling governmental interest" to defeat the plaintiff's claim. *Id.* (quotation marks omitted).

We first consider whether Anderson seeks to engage in religious exercise. "RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,'" so long as the "prisoner's request for an accommodation [is] sincerely based on a religious belief and not some other motivation." *Holt*, 574 U.S. at 360–61, 135 S. Ct. at 862 (quoting 42 U.S.C. § 2000cc-5(7)(A)). Anderson seeks to adhere to a kosher diet because of his Jewish faith. (Anderson Decl. ¶¶ 3, 4.) Clark does not dispute that eating kosher is an exercise of a religious belief. *See Spivey v. Love*, No. 11-cv-327-JPG-PMF, 2013 WL 1980509, at *6 (S.D. Ill. May 13, 2013) (prisoner's "request to receive a kosher vegan diet qualifies as 'religious exercise' under RLUIPA"); *Willis v. Comm'r, Ind. Dep't of Corr.*, 753 F. Supp. 2d 768, 777 (S.D. Ind. 2010) ("[F]or an observant Jew, demanding a kosher diet is tantamount to 'asking for accommodation of a religious exercise rooted in sincerely held beliefs.'" (quoting *Koger*, 523 F.3d at 798)). Nor does Clark question the sincerity of Anderson's religious beliefs or his desire to eat kosher. Thus, Anderson is likely to establish the first part of a *prima facie* RLUIPA case.

Next, we ask whether Clark has substantially burdened Anderson's ability to keep a kosher diet. "RLUIPA's substantial burden inquiry robustly supports inmate religious practice." *Jones*, 915 F.3d at 1150. Actions that cause a prisoner to "seriously violate[] [his] religious beliefs" meet the "substantial burden" standard. *Holt*, 574 U.S. at 361, 135 S. Ct. at 862 (second alteration in original) (quotation marks omitted); *West v. Grams*, 607 F. App'x 561, 566–67 (7th Cir. 2015) ("The correct standard [for an RLUIPA claim] is whether a particular restriction 'seriously' violates or contradicts an inmate's religious beliefs." (citing *Schlemm v. Wall*, 784

F.3d 362, 364–65 (7th Cir. 2015))). Under RLUIPA, "a substantial burden can exist even if alternatives to enduring it are available." *Njie v. Dorethy*, 766 F. App'x 387, 391 (7th Cir. 2019). For example, a prison substantially burdens a prisoner's religious exercise if it forces the prisoner to choose between, on the one hand, seriously violating his religious beliefs or, on the other hand, facing serious disciplinary action or forgoing adequate nutrition. *See, e.g.*, *Holt*, 574 U.S. at 361, 135 S. Ct. at 862; *Jones*, 915 F.3d at 1150; *see also Njie*, 766 F. App'x at 391 (policy that required the plaintiff to violate his religious beliefs by shaving his dreadlocks or forgo contact visits substantially burdened his religious practice).

Anderson does not dispute that the Meal Mart shelf-stable meals are kosher, so we are not faced with a defendant's refusal to provide meals that comply with kosher law, which would likely constitute a substantial burden on Anderson's exercise of his Jewish faith. *See Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) ("Given the strong significance of keeping kosher in the Jewish faith, the TDCJ's policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith."); *Sharp v. Liebel*, No. 3:20-CV-327-JD-MGG, 2021 WL 4147036, at *8 (N.D. Ind. Sept. 13, 2021) ("If Sharp establishes that his need for a kosher diet is a sincerely held religious belief, denial of the diet is a substantial burden to his religious practices." (citing *Jones*, 915 F.3d at 1148–50)). Instead, the question we face is whether, given Anderson's claim that he is allergic to the Meal Mart shelf-stable meals that he receives, Clark's failure to provide Anderson with *other* brands of kosher meals substantially burdens his ability to exercise his faith.

Clark contends that it does not. As an initial matter, she appears to be skeptical that Anderson is, in fact, suffering the symptoms he claims. (*See, e.g.*, Opp'n at 4 ("Plaintiff is provided a nutritious, kosher diet that he *allegedly* has reactions to." (emphasis added)); *id.* at 5

(referring to Anderson's assertion "that he is allergic to the 'shelf-stable' kosher meal" as "unsupported by his own medical records"); *id.* at 6 ("Plaintiff reports how his symptoms miraculously vanish[ed] by the time he reached the infirmary.").) But Clark does not highlight any evidence that contradicts or otherwise calls into question the veracity of Anderson's assertions regarding what happens when he eats Meal Mart shelf-stable meals. Nor does she contend that an evidentiary hearing would reveal any such evidence. We therefore credit Anderson's assertions regarding the physical reactions he has suffered when eating Meal Mart shelf-stable meals.

But even accepting the existence of Anderson's symptoms, Clark argues that Anderson "does not have a documented allergy on file to the 'shelf-stable' meals he is provided," and "[u]ntil and unless a medical professional diagnoses [Anderson] with a specific allergy associated with the 'shelf-stable' kosher meals, [he] cannot maintain that he is being forced to choose between his religious beliefs and a nutritious diet." (Opp'n at 3–4.) She asserts that "[w]ithout the benefit of allergy test results, we do not know if [Anderson's] self-reported symptoms stem from his consumption of 'shelf-stable' kosher meals provided by IDOC, from his consumption of food purchased at commissary, or by some other factor entirely." (*Id.* at 3.)

We are not persuaded. True, Anderson does not have medical test results documenting an allergy to one or more ingredients in the Meal Mart shelf-stable meals. To receive such test results, however, Anderson must first be tested, and this is not something in his control. He can only undergo an allergy test if a medical professional requests and Wexford approves such a test. And up until recently, despite Anderson's repeated requests for allergy testing, only one request for such a test had been made—a request that Wexford denied. (Anderson Decl. ¶ 22; SAC

¶¶ 72, 73; Dkt. No. 62-2 at 1, 2, 4; Dkt. No. 62-3 at 2.) We do not see why a lack of allergy test results should be held against Anderson in these circumstances.

In any event, an allergy does not need to be confirmed by an allergy test to exist in the first place.[4] An individual whose throat tightens, itches, and tingles every time he eats a peanut is likely allergic to peanuts even if he has never been formally diagnosed with a peanut allergy. The same is true here: if Anderson experiences nausea, swelling, and trouble swallowing and breathing whenever he eats a Meal Mart shelf-stable meal, he is likely allergic (or at least physically reacting) to something in the meal, even if he has not undergone allergy testing to confirm this diagnosis. As for the assertion that Anderson's symptoms could be caused by something other than the Meal Mart shelf-stable meals, such as food from the commissary, Clark does not point to any evidence that suggests this is the case.

Clark also argues that Anderson is not likely to succeed on the merits because, "[a]s detailed in [her] Motion to Dismiss," his RLUIPA claim is actually a *medical* claim.[5] (Opp'n at 2.) As Clark sees it, she is not doing anything to burden Anderson's ability to maintain a kosher diet; it is Anderson's own physical reactions that are burdening this ability. (*E.g.*, Clark MTD at 3 ("Plaintiff does not allege any obstacle *caused by Defendants* that prevent him from practicing his religion . . . . The only obstacle preventing Plaintiff from practicing his religion is his own

[4] To be clear, we are referring to a situation where an individual has not been tested for an allergy, as opposed to a situation where the individual has been tested and the test indicates that the individual does not have the suspected allergy.

[5] We remind parties that incorporating by reference arguments from other filings "is a pointless imposition on the court's time," and "[a] brief must make all arguments accessible to [] judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi*, 181 F.3d 865, 866–67 (7th Cir. 1999). Any arguments that Clark made in her motion to dismiss that are relevant to Anderson's motion for a preliminary injunction should have been included in the body of her opposition to this motion. In the interest of completeness, however, we have considered the argument to which Clark refers.

undiagnosed allergy to shelf-stable meals.").)  Thus, according to Clark, "this is a medical issue, not a religious issue."  (*Id.* at 4.)

Clark's attempt to recharacterize Anderson's claim as solely a medical issue falls flat. "[A]dverse health effects from a prison diet can be relevant to the substantial burden inquiry." *Shakur v. Schriro*, 514 F.3d 878, 888–89 (9th Cir. 2008) (addressing a RLUIPA claim where the prisoner received a vegetarian diet that, while compliant with his religious beliefs, exacerbated his hiatal hernia and caused excessive gas).  Although Anderson's physical reactions to the Meal Mart shelf-stable foods may add an extra element into the mix, it does not negate the ultimate religious nature of his complaint.

Consider the situation in *Jones*.  In that case, the prison refused to provide the plaintiff, an inmate whose religious beliefs required him to regularly eat halal meat, with meals that included halal meat.  915 F.3d at 1148.  The plaintiff could have bought halal meat at the commissary but doing so would have required him to "zero out his account and forgo purchasing other items such as hygiene products or over-the-counter medicine."  *Id.* at 1150.

Viewing *Jones* as Clark views the situation here, one would say the issue was financial, not religious.  After all, halal meat was available at the commissary; the plaintiff just could not buy this food on a regular basis because of his lack of financial resources.  And indeed, the defendant argued that because the inmate could have purchased halal meat at the commissary, his lack of meat was merely "the result of 'his own spending choices[.]'"  *Id.* at 1149.  The Seventh Circuit, however, rejected this argument and found that the plaintiff's desire to eat halal meat was substantially burdened.  *Id.* at 1150.  Similarly, kosher food is available to Anderson, but he cannot eat it because of the physical reactions that occur when he does.  Just as the plaintiff in *Jones* was not, "uniquely among all inmates," required "to give away his last dime so

that his daily meals [would] not violate his religious practice," *id.*, we do not believe that Anderson, "uniquely among all inmates," must endure painful physical reactions just so he can keep a daily diet that complies with his religious beliefs.

Ultimately, Clark's failure to provide Anderson with kosher meals other than the Meal Mart shelf-stable meals forces him to make one of three choices. First, he can eat non-kosher meals, thereby violating his sincerely held religious beliefs. Second, he can eat the Meal Mart shelf-stable meals and deal with the accompanying "pain, discomfort, swelling, and trouble breathing." (SAC ¶ 150.) Third, he can forgo both non-kosher meals and Meal Mart shelf-stable meals and subsist on a daily diet consisting primarily of lettuce, bread (or matzoh), and a few pieces of fruit, supplemented at times by purchases from the commissary.

This is "precisely the type of pressure that substantially burdens the free exercise of [Anderson's] religious practice." *Rains v. Washington*, No. 2:20-cv-32, 2020 WL 1815839, at *1–2, *8 (W.D. Mich. Apr. 10, 2020) (addressing similar allegations by the plaintiff, a practicing Muslim prisoner, about the defendants' failure to accommodate his soy allergy by providing him with a nutritionally adequate halal meal that does not contain soy); *see also Davis v. Harper*, No. 18-cv-1119-SMY, 2018 WL 4409955, at *1–2 (S.D. Ill. Sept. 17, 2018) (allowing an inmate's First Amendment free exercise of religion claim to proceed where he alleged that the defendants accommodated his religious diet by serving food to which he had a documented allergy). If Anderson wants to exercise his religious beliefs by adhering to a kosher diet, he must either eat an inadequately nutritious diet[6] or suffer significant physical reactions that often require medical

[6] Anderson asserts that without the Meal Mart shelf-stable meals, his diet provides roughly 900 calories per day, which is less than the 1,800 to 2,000 calories recommended for adults on a daily basis. (Mem. at 12.) He also asserts that the Meal Mart shelf-stable portions provide the kosher meals' main source of protein and nutrients. (*Id.*) Clark does not dispute these assertions or otherwise contend that Anderson's current daily diet is nutritionally adequate.

assistance. Given that an inmate faced with only the first option is substantially burdened, *see Jones*, 915 F.3d at 1150, the additional availability of the second option, which similarly harms the inmate, does not in any way alleviate the burden he faces. *See Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (substantial burden exists when the plaintiff is presented with "an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise").

Courts must "take religious claimants as we find them." *Id.* For most of the inmates at Illinois River who desire to eat kosher, the Meal Mart shelf-stable kosher meals may be adequate. But they are not for Anderson. Based on the record before us, Anderson is likely to show that Clark's failure to provide him with kosher meals other than the Meal Mart shelf-stable meals substantially burdens his religious exercise.

Because Anderson has demonstrated that he is likely to establish a *prima facie* case under RLUIPA, we must now consider whether Clark has shown that her actions are "the least restrictive means of furthering a compelling governmental interest." *See Koger*, 523 F.3d at 800. She has not met this burden. In fact, Clark's opposition to Anderson's motion is devoid of any contention that her failure to accommodate Anderson either (1) furthers a compelling governmental interest or (2) is the least restrictive means of doing so. (*See generally* Opp'n.) Accordingly, we find that Anderson is likely to succeed on the merits of his RLUIPA claim. *See Koger*, 523 F.3d at 801 (where the prisoner made a *prima facie* case that the prison's practices substantially burdened his religious exercise and the prison officials failed to show that these "practices were the least restrictive means of furthering a compelling government interest," judgment in the prisoner's favor on his RLUIPA claim was warranted).

**2. Eighth Amendment**

In Count III, Anderson asserts that Clark deprived him of "nutritionally adequate food [that] does not present an immediate danger to his health and well-being." (SAC ¶ 148.) Anderson brings this claim under 42 U.S.C. § 1983,[7] which "is the vehicle for bringing claims under the Constitution," *Harris v. City of Chicago*, No. 1:20-CV-00452, 2021 WL 1192438, at *5 (N.D. Ill. Mar. 30, 2021), and the Eighth Amendment. "The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S. Ct. 2321, 2323 (1991) (citation omitted). It "places both restraints and duties on prison officials, and one of those duties is to ensure that inmates receive adequate food." *Williams v. Shah*, 927 F.3d 476, 479 (7th Cir. 2019). Specifically, prisons must provide inmates with "nutritionally adequate food that is prepared and served under conditions [that] do not present an immediate danger to the health and well[-]being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (quotation marks omitted).

To establish an Eighth Amendment violation based on a prison official's failure to provide nutritionally adequate food, an inmate must satisfy two requirements. *Williams*, 927 F.3d at 479 (addressing prison officials' alleged failure to provide a nutritionally adequate brunch program). "First, the inmate must demonstrate that the deprivation suffered was, objectively, 'sufficiently serious.'" *Id.* at 479–80 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)). "Second, the inmate must demonstrate that the prison official" was deliberately indifferent to the inmate's health or safety. *Id.* at 480. This subjective

[7] Count III incorrectly refers to "28 U.S.C. § 1983," but Anderson clearly intends to invoke 42 U.S.C. § 1983. (*See* SAC ¶ 4 (alleging that he is bringing his constitutional claims "pursuant to 42 U.S.C. § 1983").)

element requires the official to act with a sufficiently "culpable state of mind, something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 395, 397 (7th Cir. 2006). The official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

Anderson has not demonstrated that he will likely show that Clark has acted with deliberate indifference. Anderson contends that "Clark was or should have been aware of [his] condition" because he informed other IDOC employees—including Meaker, Clark's predecessor as Illinois River's warden, and Illinois River's Assistant Warden for Operations—about his suspected allergic reactions and inability to eat the Meal Mart shelf-stable meals. (Mem. at 13.) But we see nothing in the current record suggesting that any of these employees conveyed his or her knowledge of Anderson's situation to Clark. And even if the circumstances were such that Clark "should have been aware" of a risk to Anderson's health or safety, that is not enough to meet the deliberate indifference standard. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004). Simply asserting that Clark was or should have been aware of Anderson's condition because others were aware of his condition does not demonstrate how Anderson proposes to prove the key subjective element of his deliberate indifference claim against Clark. *See Ill. Republican Party*, 973 F.3d at 762–63 (explaining that showing some likelihood of success "normally includes a demonstration of how the applicant proposes to prove the key elements of its case").

* * *

To recap, Anderson has shown that he is likely to succeed on his RLUIPA claim against Clark but not on his Eighth Amendment claim against her. For Anderson's RLUIPA claim, this showing alone likely warrants granting him preliminary injunctive relief. Clark concedes that

Anderson's "RLUIPA rights to a kosher meal are also First Amendment rights" (Opp'n at 5),[8] "and in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (quotation marks omitted) (finding that preliminary injunctive relief was warranted on the strength of the plaintiffs' claim under the Religious Freedom Restoration Act ("RFRA"), which protects First Amendment free-exercise rights); *Weston v. Baldwin*, No. 19-cv-01020-NJR, 2020 WL 4430802, at *4 (S.D. Ill. July 31, 2020) ("In the context of First Amendment and RLUIPA cases, the likelihood of success on the merits is usually the decisive factor in deciding a motion for preliminary injunction." (quotation marks omitted)). But in the interest of completeness, we will evaluate the remaining preliminary injunction factors with respect to Anderson's RLUIPA claim. As for Anderson's Eighth Amendment claim, his failure to show a likelihood of success means that we do not need to "conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'" for this claim. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 367–68 (7th Cir. 2019). Even so, because the Seventh Circuit has encouraged district courts "to conduct at least a cursory examination of all the [] preliminary injunction considerations" even when they decide that the movant "has not satisfied one of the threshold requirements," *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1087 (7th Cir. 2008), we do so for Anderson's Eighth Amendment claim as well.

[8] Like RLUIPA, the First Amendment prohibits the government from substantially burdening an individual's religious practices in certain circumstances. *See Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013).

### B. Irreparable Harm and Adequacy of Legal Remedies

Anderson must also establish "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). A likelihood of suffering irreparable harm "requires more than a mere possibility of harm." *Id.* at 502 (quotation marks omitted). "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine*, 8 F.4th at 545; *see also Orr*, 953 F.3d at 502 ("[I]rreparable harm . . . [is] harm that 'cannot be repaired' and for which money compensation is inadequate." (citation omitted)). "Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Life Spine*, 8 F.4th at 545 (quotation marks omitted).

Clark's failure to provide Anderson with alternative kosher meals will likely irreparably harm Anderson. It will substantially burden his right to observe a kosher diet in accordance with his Jewish faith. Restricting a prisoner's right to freely exercise his religion unquestionably results in irreparable harm that is not compensable by monetary damages. *Cassell*, 990 F.3d at 545; *Knowles v. Pfister*, 829 F.3d 516, 518–19 (7th Cir. 2016); *Korte*, 735 F.3d at 666. Anderson has therefore demonstrated that, without an injunction, Clark's inaction will likely harm his rights under the RLUIPA in a way that cannot be compensated by legal remedies.

Failing to provide Anderson with alternative kosher meals will also force him, day in and day out, to either forgo the entrée portions of his lunch and dinner meals (and deal with hunger and a lack of adequate nutrition) or eat these portions and suffer nausea, swelling, and trouble swallowing and breathing. Either choice results in ongoing pain and discomfort that cannot be adequately remedied by a post-judgment monetary award. *See Holleman v. Wexford Health of Ind., Inc.*, No. 2:19-cv-00366-JPH-MJD, 2020 WL 2097783, at *2–3 (S.D. Ind. May 1, 2020) (painful physical symptoms experienced by the plaintiffs when they ate foods that did not meet

their requested dietary requirements constituted irreparable harm for which traditional legal remedies would be inadequate); *Orr v. Liaw*, No. 3:19-CV-154-JD-MGG, 2019 WL 4594609, at *2 (N.D. Ind. Sept. 20, 2019) ("Ongoing suffering caused by pain is an irreparable harm. Money can compensate for past pain, but that alone is not a justification for unnecessarily protracting current suffering."). Clark argues otherwise (*see* Opp'n at 6), but she does not cite any authority or give any explanation as to why money damages adequately compensate Anderson for his ongoing pain. Without an injunction, Anderson will experience irreparable harm in this way too.

Clark offers other rejoinders, but none is persuasive. First, Clark argues that the harm we must consider is "the harm stemming from [Anderson's] alleged symptoms after eating the 'shelf-stable' kosher meal," which is not irreparable because the symptoms "subside within the hour of his consumption of the meal." (*Id.* at 5–6.) As we have just recognized, this is one harm caused by Clark's failure to provide alternative kosher meals, but it is not the *only* harm. Clark does not explain why we should ignore the primary harm caused by her RLUIPA violation—the substantial burden on Anderson's ability to adhere to kosher dietary law in accordance with his religious beliefs. At any rate, the pain and discomfort Anderson experiences while eating the Meal Mart shelf-stable meal can still constitute irreparable harm even though this pain and discomfort eventually go away. *See Bentz v. Ghosh*, 718 F. App'x 413, 420 (7th Cir. 2017) (explaining that "pain may be irreparable harm though it is episodic and treated without prescription drugs" and finding that the district court erred in concluding that a refusal to treat intermittent tooth pain, which affected the prisoner's "ability to eat and swallow, was not evidence of irreparable harm").

Second, Clark argues that Anderson's possibility of harm is speculative because his medical records do not support his alleged symptoms and IDOC has not documented that he has

an allergy to any food provided to him. (Opp'n at 6.) Notably, though, Clark does not direct us to the medical records (or any other evidence) that purportedly undercut Anderson's assertions about his symptoms. And medical records provided by Anderson with his Reply show that he reported symptoms like the ones he now claims on numerous occasions. (*See* Dkt. No. 62-1.) We also do not see why Anderson must be formally diagnosed with an allergy before we can find credible his assertions regarding his reactions when eating Meal Mart shelf-stable meals, especially when the absence of allergy test results is due, at least in part, to Wexford's failure to approve such a test when it was requested by Dr. Sood.

Third, Clark argues that Anderson can be adequately compensated by requesting "damages related to money spent at commissary to supplement his diet." (Opp'n at 6.) But this argument ignores the harm caused by the burden on Anderson's right to exercise his religion and the pain and discomfort he experiences when he is forced to either eat the Meal Mart shelf-stable meals or subsist on a daily diet made up primarily of matzoh, lettuce, and fruit.

Because Anderson has demonstrated irreparable harm that cannot be adequately compensated by legal remedies, we proceed to the next step of our analysis.

**C. Balance of Harms and Public Interest**

We next weigh the harm of denying an injunction to Anderson against the harm to Clark of granting one, as well as any effect that granting or denying Anderson's requested injunction will have on the public interest. *See Life Spine*, 8 F.4th at 539; *Cassell*, 990 F.3d at 545.

The balance of harms weighs heavily in favor of Anderson's request. Anderson is likely to succeed on the merits of his RLUIPA claim, so the balance of harms favors granting preliminary injunctive relief "because injunctions protecting First Amendment freedoms are always in the public interest." *See Korte*, 735 F.3d at 666 (quotation marks omitted). What is more, every day that Anderson does not receive alternative kosher meals is another day that he is

physically harmed, whether by trying to subsist on lettuce, matzoh, and fruit, or by enduring the effects of eating the Meal Mart shelf-stable meals. In contrast, Clark does not identify any harm that will befall her if we grant Anderson's requested injunction. For instance, she does not contend that providing Anderson with alternative kosher meals will cost too much money or will negatively affect how she carries out her duties as Illinois River's warden. In fact, Clark makes no effort to argue that the balance of harms weighs in favor of denying Anderson's requested injunction, so she has conceded the point. *See id.* (the government's failure to address equitable balancing "conced[ed] the point to the plaintiffs").

**D. Compliance with the PLRA**

Separate from the traditional preliminary injunction analysis, Clark contends that Anderson's request for injunctive relief cannot be sustained under the Prisoner Litigation Reform Act ("PLRA"). (*See* Opp'n at 7–10.) The PLRA requires any preliminary injunctive relief in the prison condition context to "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In tailoring preliminary injunctive relief, we must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief" and generally refrain from ordering a government official to act contrary to state or local law. *Id.* § 3626(a)(1)(B), (a)(2).

Clark argues that Anderson's request for a preliminary injunction is not "narrowly drawn" for three reasons. (Opp'n at 7.) We address each argument in turn.

First, Clark contends that Anderson's request for a preliminary injunction is not "narrowly drawn" because it is indefinite, vague, "and impossible to comply with." (*Id.*) She claims that "IDOC cannot provide [Anderson] with a 'kosher diet to which he is not allergic' when IDOC has no knowledge of, and the record does not support the existence of, any allergy."

(*Id.*) This argument is meritless. Even without the results of allergy testing, the current record suggests that Anderson suffers allergic reactions to the Meal Mart shelf-stable meals. And although Clark may not know precisely which ingredients in these meals cause Anderson's reactions, she does know of at least three other brands of kosher meals that do *not* trigger these reactions: Spring Valley, My Own Meal Inc., and Meal Mart frozen brands. (Anderson Decl. ¶¶ 6, 18, 23.)

Second, Clark contends that granting Anderson's request for preliminary injunctive relief would improperly "give him substantially all the relief he seeks through this lawsuit" and that we should not grant this relief before she can move for a hearing under *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). (Opp'n at 7–8.) We disagree. Although "[a] preliminary injunction that would give the movant substantially all the relief he seeks is disfavored," *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826 n.6 (7th Cir. 1998), Anderson's lawsuit seeks more than an order requiring Clark to provide him with alternative kosher meals; it also seeks compensatory and punitive damages against several other defendants. (*See* SAC at 1, 26.) Clark does not explain how Anderson's request for a preliminary injunction against her constitutes "substantially all" the relief he seeks in light of this other requested relief.

Clark's *Pavey*-related argument fares no better. Under *Pavey*, if the parties contest whether a prisoner exhausted his available administrative remedies, a district court must hold a hearing—normally before pretrial discovery on the merits begins—to resolve any material factual disputes. *See Pavey*, 544 F.3d at 742; *Winston v. Clarke*, 746 F. App'x 561, 563 (7th Cir. 2018). If there are no disputed material facts on the exhaustion issue, however, a *Pavey* hearing is not necessary. *Northern v. Dobbert*, 816 F. App'x 11, 14 (7th Cir. 2020). Here, Clark does not identify any facts that bear on whether Anderson exhausted his administrative remedies, let

alone disputed facts that would require us to hold a *Pavey* hearing. Nor does Clark cite any authority holding that the mere possibility that a defendant will move for a *Pavey* hearing justifies denying a prisoner's request for preliminary injunctive relief. To the contrary, Clark's assertion that she may ask for a *Pavey* hearing suggests that it is *not* readily apparent that Anderson failed to exhaust his administrative remedies. *See Wagoner v. Lemmon*, 778 F.3d 586, 588 (7th Cir. 2015) ("Often exhaustion (or its lack) will be apparent, *but when it is not*, the district court must hold an evidentiary hearing to resolve the question." (emphasis added)). Furthermore, failure to exhaust is an affirmative defense that Clark must prove. *Winston*, 746 F. App'x at 563. Because "the burdens at the preliminary injunction stage track the burdens at trial," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429, 126 S. Ct. 1211, 1219 (2006), to defeat Anderson's request for a preliminary injunction based on this defense, Clark must show that she is likely to succeed on it. *See id.* at 428–30, 126 S. Ct. at 1219–20. Asserting in conclusory fashion that a hearing *may* be needed to resolve unidentified factual issues on the exhaustion issue, as Clark has done, does nothing to meet this burden.

Third, Clark argues that we should deny Anderson's request because it seeks "to interfere with the State's administration of its own prisons"; specifically, it "would strip IDOC of its ability to administer food to its inmates according to the needs and limitations of the State of Illinois." (Opp'n at 8–9.) To be sure, IDOC has "broad administrative and discretionary authority over the institutions" it manages, *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quotation marks omitted), and we are cognizant of the strong interest Illinois has in administering its prisons without judicial intervention. *See Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S. Ct. 1827, 1837 (1973). We similarly recognize the importance of federalism

considerations when deciding whether to order a state prison to alter its administrative practices. *See Rizzo v. Goode*, 423 U.S. 362, 378–79, 96 S. Ct. 598, 607–08 (1976).

These principles, however, do not provide a blanket justification for denying Anderson's request for injunctive relief. Although federal courts are "most reluctant to interfere with the internal administration of state prisons," they will still "intervene to remedy unjustified violations" of a prisoner's constitutional rights. *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir. 1988). And where a prisoner's right to freely exercise his religion is (or is likely) being infringed, as is the case here, courts have not been hesitant to issue injunctions ordering prisons to change their ways. *See, e.g.*, *Knowles*, 829 F.3d at 518–19 (instructing district court to issue a preliminary injunction entitling prisoner to wear a religious medallion); *Schlemm*, 784 F.3d at 366 (instructing district court to issue a preliminary injunction entitling prisoner to wear a headband and receive venison for religious purposes); *Beerheide v. Suthers*, 286 F.3d 1179, 1184, 1192 (10th Cir. 2002) (affirming a permanent injunction requiring prison to provide kosher food free of charge); *Felton v. Comm'r of Ind. Dep't of Corr.*, No. 1:20-cv-01253-JPH-DLP, 2021 WL 1090256, at *1, *3 (S.D. Ind. Mar. 22, 2021) (granting request for preliminary injunction requiring the Indiana Department of Correction to "recognize Druidism as a separate and distinct religion" and "permit Druids the same opportunities for communal worship that are afforded to other religions"); *Jones v. Comm'r, Ind. Dep't of Corr.*, No. 1:16-cv-2887-WTL-MJD, 2017 WL 3398002, at *3 (S.D. Ind. Aug. 8, 2017) (entering permanent injunction requiring the Indiana Department of Correction to regularly provide meals with halal or kosher meat to prisoner), *aff'd sub nom. Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019); *Borkholder v. Lemmon*, 983 F. Supp. 2d 1013, 1020 (N.D. Ind. 2013) (entering permanent injunction precluding the Indiana Department of Correction from revoking prisoner's vegan diet in certain

circumstances); *Kuperman v. N.H. Dep't of Corr.*, No. 06-CV-420-JD, 2007 WL 1200092, at *1, *6 (D.N.H. Apr. 18, 2007) (recommending the entry of a preliminary injunction restoring prisoner to a kosher diet and precluding the prison from suspending the prisoner's kosher diet in certain circumstances).

Tellingly, Clark provides no evidence that she cannot provide Anderson with Spring Valley, My Own Meal Inc., or Meal Mart frozen kosher meals, or that doing so, while possible, will cost too much, create security issues, or otherwise hamper her ability to run Illinois River. Clark tries to fault Anderson and the early stage of this litigation for the lack of some of this evidence, arguing that Anderson "has no evidence regarding IDOC's food supply or reasons why IDOC switched to 'shelf-stable' meals" and that "discovery has not yet shed light on IDOC's food supply and whether the alternate meals are even available." (*See* Opp'n at 9–10.) But even without discovery, IDOC should know why it switched to shelf-stable meals, as well as the status of its food supply, including whether alternative kosher meals are available. Moreover, this information should be available to Clark, Illinois River's warden. Clark could have investigated the feasibility of providing Anderson with alternative kosher meals and, if it was not feasible, provided the affidavit of someone knowledgeable about the matter. *See Ty*, 132 F.3d at 1171 ("Affidavits . . . are fully admissible in summary proceedings, including preliminary-injunction proceedings."). She has not done so. In short, although judicial intervention may unduly interfere with a prison's administration in certain circumstances, Clark has not shown that such intervention will interfere with prison administration in *these* circumstances.

Accordingly, Clark's PLRA-related arguments do not convince us that we must wholly deny Anderson's request for preliminary relief.

### E.     Summary of Analysis

After conducting the required analysis, we conclude that Anderson is entitled to a preliminary injunction.  Anderson is likely to succeed on his RLUIPA claim; he has demonstrated irreparable harm that is not adequately compensated by legal remedies; he has shown that the balance of harms (including the public interest) weighs in favor of granting a preliminary injunction; and the PLRA does not preclude granting his request for relief.

## III.     Rule 65(c) Bond

Although neither Anderson nor Clark addresses the issue, we must also consider the appropriate amount of security that Anderson must post before he can obtain a preliminary injunction.  *See USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 441 (N.D. Ill. 2019).  Under Federal Rule of Civil Procedure 65(c), we "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "The appropriate amount of the bond is subject to the court's discretion."  *USA-Halal Chamber of Com.*, 402 F. Supp. 3d at 441 (quotation marks omitted).  And "[u]nder appropriate circumstances," we may excuse the bond requirement. *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977).  Such circumstances may include when the moving party is indigent, *id.*, "when the suit is about constitutional principles," *BankDirect Capital Finance, LLC v. Capital Premium Financing, Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019), and when there is "no danger that the opposing party will incur any damages from the injunction," *Habitat Education Center v. United States Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010).

Excusing payment of a bond is appropriate in these circumstances.  First, Anderson has been incarcerated for almost two decades and is proceeding *in forma pauperis*.  (*See* Anderson

Decl. ¶ 2; Dkt. No. 8 at 1 (granting Anderson's *in forma pauperis* application).) We therefore presume that he does not have the financial means to post a bond of any meaningful amount. Second, we are issuing a preliminary injunction to ensure that Anderson's right to freely exercise his religion—a First Amendment right—is not substantially burdened. Third, Clark does not contend that she will incur any costs or damages as a result of providing Anderson with alternative kosher meals or that any particular amount of security is necessary before Anderson can obtain a preliminary injunction. (*See generally* Opp'n.) For these reasons, we conclude that Anderson does not need to post a bond for his requested preliminary injunction.

**IV. Scope of Injunction**

Finally, we must define the scope of the preliminary injunction. As already noted, any preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm" at issue, and constitute "the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The injunction must also "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C).

Anderson asks for an order requiring Clark to provide him "with a kosher diet to which he is not allergic that satisfies basic nutritional standards until the results of allergy testing can be confirmed and Anderson's allergy can be accommodated by IDOC[.]" (Am. Mot. at 4.) As worded, this request is too vague. For instance, how many kosher meals must Anderson receive daily? What brands of meals can Clark serve Anderson? And what happens if Anderson's allergy testing results reveal that he is not allergic to Meal Mart shelf-stable kosher meals?

To answer these and other questions that Anderson's request leaves open, we will specifically require Anderson to be provided with lunch and dinner entrée portions of a Spring Valley, My Own Meal Inc., or Meal Mart frozen kosher brand meal every day. This requirement is appropriate because (1) Anderson only complains about not being able to eat kosher entrées

during lunch and dinner; (2) Anderson does not argue that the Spring Valley, My Own Meal Inc., or Meal Mart frozen kosher brand meals fail to satisfy basic nutritional standards; and (3) Anderson contends that he can eat these brands without suffering the physical reactions he suffers when he eats Meal Mart shelf-stable brand meals. We will also order counsel for Anderson and Clark to promptly meet and confer once the results of Anderson's currently scheduled allergy consultation, including any allergy testing performed at or as a result of this consultation, become available. Counsel must discuss if and how the results impact our preliminary injunction order, and promptly thereafter file a joint status report advising us about their respective positions on next steps forward. After we review the parties' joint status report, we will then determine whether modifying or dissolving the preliminary injunction order is warranted.

A preliminary injunction order along these lines complies with the dictates of both the PLRA and Rule 65. It requires Clark to change her actions with respect to only one inmate; it does not require her to modify Illinois River's general policies regarding the delivery of food to its inmates. It also spells out what Clark must do with specificity. Finally, it anticipates a potential change in circumstances (the results of Anderson's allergy testing) and directs the parties to promptly advise us of this change so we may reevaluate the need for a preliminary injunction.

**CONCLUSION**

We are mindful that injunctions requiring a defendant to affirmatively act "are ordinarily cautiously viewed and sparingly issued." *Mays*, 974 F.3d at 818 (quotation marks omitted). Nonetheless, after carefully considering the facts before us and the preliminary injunction factors, we conclude that this is one of those cases where such an injunction is necessary. For

the foregoing reasons, we grant Anderson's motion for preliminary injunction (Dkt. No. 42). A separate preliminary injunction order will issue. It is so ordered.

Marvin E. Aspen
Honorable Marvin E. Aspen
United States District Judge

Dated: October 12, 2021