UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK ANDERSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DR. CATHERINE LARRY et al., )<br>)<br>Defendants. ) | No. 21-cv-944<br><br>Judge Marvin E. Aspen |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Before us are motions to dismiss filed by Defendants Jennifer Meaker and Tiffanie Clark under Federal Rule of Civil Procedure 12(b)(6). (Defendant Meaker's Motion for Involuntary Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) ("Meaker Mot.") (Dkt. No. 33); Defendant Clark's Motion for Involuntary Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) ("Clark Mot.") (Dkt. No. 34).)[1] Plaintiff Mark Anderson opposes these motions. (Plaintiff's Memorandum in Opposition to Defendant Clark's Motion for Involuntary Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) ("Opp'n to Clark Mot.") (Dkt. No. 49); Plaintiff's Memorandum in Opposition to Defendant Meaker's Motion for Involuntary Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) ("Opp'n to Meaker Mot.") (Dkt. No. 51).) For the following reasons, Meaker's and Clark's motions are denied.

## FACTUAL BACKGROUND

We take the following factual background from the operative Third Amended Complaint, "documents attached to the [Third Amended Complaint], documents that are critical to the [Third

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Amended Complaint] and referred to in it, [] information that is subject to proper judicial notice[,]" and any additional facts set forth in Anderson's opposition, "so long as those facts are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quotation marks omitted). We have accepted all well-pleaded factual allegations as true and have drawn all reasonable inferences in Anderson's favor. *Id.*; *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016).

Anderson is a prisoner in the custody of the Illinois Department of Corrections ("IDOC"). (Third Amended Complaint ("3AC") (Dkt. No. 95) ¶ 7.) He is Jewish, and prior to his incarceration, he "strictly observed kosher dietary law in conformance with his faith." (*Id.* ¶ 18.) "Pursuant to his religious beliefs, Anderson has promptly sought and eventually has been admitted to the kosher meal program at each IDOC facility" where he has been housed since he was incarcerated in 2003. (*Id.* ¶ 19.)

From 2003 to 2013, Anderson ate the kosher meals offered to him by IDOC without incident. (*Id.* ¶ 20.) But in mid-2017, Pinckneyville Correctional Center, where Anderson was housed at the time, began serving Meal Mart "shelf-stable" brand ready-to-eat meals as the entrée portion of its kosher lunch and dinner meals. (*Id.* ¶¶ 21, 22.) Anderson ate one of these meals and "developed a physical reaction, including tingling in his throat and tongue, and nausea lasting up to half a day." (*Id.* ¶ 23.) Anderson suspected this was an allergic reaction to the Meal Mart shelf-stable meal, and he informed Pinckneyville's dietary manager of the problem. (*Id.* ¶¶ 23, 24.) The dietary manager was able to procure a different brand of prepared kosher meal for Anderson, which he was able to eat without suffering a similar reaction. (*Id.* ¶ 24.) After supplies of the substitute meal were exhausted in late 2017, however, Anderson was forced to either eat the Meal Mart shelf-stable meals again—which he did only a handful of times

because he continued to experience physical reactions to the meals—or supplement his diet with purchases from Pinckneyville's commissary when he could. (*Id.* ¶¶ 25–27.)

In December 2017, IDOC transferred Anderson to Joliet Treatment Center ("JTC"). (*Id.* ¶¶ 8, 28.) Upon arriving at JTC, Anderson immediately requested to be put on the kosher meal plan, but he was erroneously informed that JTC did not offer such a plan. (*Id.* ¶ 29.) After Anderson discovered that JTC did offer a kosher meal program, he again requested admission to the program. (*Id.*) He was admitted to the program in October 2018. (*Id.* ¶ 31.)

At this time, the kosher meals JTC provided for lunch and dinner were the Meal Mart shelf-stable meals. (*Id.* ¶¶ 32, 42.) Anderson ate these meals on multiple occasions in October 2018, hoping that "his allergy concerns were either mistaken or exaggerated" and "wishing to enjoy a nutritionally adequate diet." (*Id.* ¶ 33.) Each time, however, Anderson experienced similar physical reactions to the ones he experienced when eating the meals at Pinckneyville, as well as a reddened and swollen tongue and cheek, tightness in his throat, and difficulty swallowing. (*Id.* ¶¶ 33, 34.) In each instance, Anderson requested medical assistance and was referred to JTC's infirmary, but by the time he was transferred to the infirmary—a process that often took at least 45 minutes—his symptoms had abated. (*Id.* ¶ 35.)

In mid-October 2018, Anderson filed a grievance in which he informed JTC of his suspected allergic reactions to the Meal Mart shelf-stable meals, asserted that he was not receiving an adequately nutritional diet because of his inability to eat these meals, and requested an alternative meal. (*Id.* ¶ 36.) Later that month, he relayed the same information to Kathryn Buckley, JTC's Food Service Program Manager, who was responsible for the operation of JTC's kosher meal program. (*Id.* ¶¶ 12, 37.) Nonetheless, JTC did not provide Anderson with another brand of kosher meal or additional food. (*Id.* ¶ 41.) To avoid the painful physical reactions that

3

occurred when he ate the Meal Mart shelf-stable meals, which constituted most of the food provided for lunch and dinner, Anderson "subsist[ed] solely on the remaining food items provided to him as part of JTC's kosher diet": dry cereal, lettuce, bread (or crackers), peanut butter, jelly, and fruit. (*Id.* ¶¶ 42, 44, 45.)

On December 5 and 6, 2018, Anderson again ate the Meal Mart shelf-stable meals. (*Id.* ¶ 48.) He experienced a swollen tongue and difficulty swallowing and breathing, and he was taken to JTC's infirmary, where his symptoms were recorded. (*Id.*) That month, Anderson was referred to Dr. Kul Sood. (*Id.* ¶ 49.) Dr. Sood is a physician employed by Wexford Health Sources, Inc. ("Wexford"), which contracts with IDOC to provide medical care and treatment to inmates. (*Id.* ¶ 14.) Anderson informed Dr. Sood of his history of reactions to the Meal Mart shelf-stable meals. (*Id.* ¶ 50.) Dr. Sood responded by telling Anderson that if he felt he was allergic to these meals, he should stop eating them. (*Id.* ¶ 51.)

In April 2019, after Anderson contacted a religious affinity organization asking for help in obtaining "a nutritionally sufficient and religiously compliant meal," Anderson began receiving one serving of tuna fish with lunch. (*Id.* ¶¶ 52–55.) He was told that the tuna fish was provided to address his "apparent problem" with the shelf-stable meals. (*Id.* ¶ 56.) For the remainder of his time at JTC (approximately two years), Anderson's daily diet generally consisted of the following: dry cereal, bread (or crackers), peanut butter, jelly, and one piece of fruit for breakfast; lettuce, bread (or crackers), one serving of tuna fish, and one piece of fruit for lunch; and lettuce, bread (or crackers), and one piece of fruit for dinner. (*Id.* ¶ 57.) He supplemented his diet by purchasing commissary items with his personal funds, but "given the expense of these items, as well as the relative scarcity of kosher items at the prison's [c]ommissary," he could not "maintain his daily caloric intake at appropriate levels." (*Id.* ¶¶ 86,

4

87.) As a result, Anderson lost significant weight and has experienced fatigue, numbness in his right leg, anger, and mood swings since mid-2019. (*Id.* ¶¶ 83–85.) Anderson also ate the Meal Mart shelf-stable meals again on two occasions in December 2020 and January 2021, hoping that his suspected allergy had abated and that he could enjoy a fully nutritional meal. (*Id.* ¶ 76.) Both times, however, Anderson experienced a severe physical reaction that included wheezing, difficulty breathing, and a severely swollen tongue. (*Id.* ¶¶ 77–79.)

"While at JTC, Anderson was informed that he would not be provided with an alternative meal because there was no documented allergy in his medical file." (*Id.* ¶ 60.) Anderson also alleges upon information and belief that JTC's policy is to not provide an inmate with diet accommodations unless there is "a positively documented allergy test in the inmate's medical file." (*Id.* ¶ 59.) In September 2019, an allergy test was requested for Anderson, but unknown personnel at Wexford denied the request. (*Id.* ¶ 63.) Although Wexford acknowledged that Anderson's medical file documented the complained-of symptoms since 2018, it denied the request for allergy testing because "Anderson had allegedly purchased non-kosher foods at the prison commissary" and it believed that his participation in a weight-loss program, not the lack of an adequate diet, had been the reason for Anderson's weight loss. (*Id.* ¶¶ 64, 65.)

On or about April 5, 2021, IDOC transferred Anderson from JTC to Illinois River Correctional Center. (*Id.* ¶¶ 8, 88.) Like JTC, Illinois River serves Meal Mart shelf-stable meals for the lunch and dinner meals of its kosher meal program. (*Id.* ¶ 91.) Anderson was enrolled in the kosher meal program on April 6. (*Id.* ¶ 89.) Upon arriving at Illinois River, Anderson also completed a medical intake form in which he "informed the nurse about his history of suspected allergic reactions to the Meal Mart 'shelf-stable' kosher meals and his resultant inability to consume those meals." (*Id.* ¶ 90.) On April 7, Anderson wrote a letter to Tracy Bordner, Illinois

5

River's Assistant Warden for Operations, "describing his symptoms and his suspect[ed] allergy to the Meal Mart 'shelf-stable' kosher meals, his inability to consume those meals, and his need for dietary accommodation in order to obtain sufficient nutrition in compliance with his religious beliefs." (*Id.* ¶ 92.) In response, Anderson was told that his concerns had been relayed to Illinois River's chaplain and Health Care Unit for review, and that he "should follow up with the Health Care Unit regarding any medical issues." (*Id.* ¶ 93.) On April 9, Anderson spoke with Cherryle Hinthorne, Illinois River's warden at the time, and "informed her of his history of suspected allergic reactions to the Meal Mart 'shelf-stable' kosher meals, his inability to consume those meals, and his need for dietary accommodation in order to obtain sufficient nutrition in compliance with his religious beliefs." (*Id.* ¶ 94.) Even so, Anderson was not provided with an alternative kosher meal. (*Id.* ¶ 95.)

On April 12, Anderson again tried eating a Meal Mart shelf-stable meal, hoping that his suspected allergic reaction to the food had lessened. (*Id.* ¶ 96.) It had not; "[i]mmediately upon eating the meal, Anderson experienced distress and requested help, after which jail staff called a 'Code 3.'" (*Id.* ¶ 97.) Anderson was transported to the healthcare unit, where medical personnel assessed and monitored him until his symptoms had abated. (*Id.*) Anderson then "informed the medical personnel of his reactions to the Meal Mart 'shelf-stable' meal, the development and worsening of his symptoms, and the lack of an adequately nutritional diet as a result." (*Id.* ¶ 98.) The medical personnel prescribed Claritin and told Anderson to avoid eating foods to which he suspected he was allergic. (*Id.* ¶ 99.)

Anderson later wrote a letter to Brian Peters, Illinois River's Food Service Program Manager, in which he informed Peters of his "history of suspected allergic reactions to the Meal Mart 'shelf-stable' kosher meals and his resulting lack of sufficient nutrition." (*Id.* ¶ 100.)

Peters responded by stating that he had contacted Illinois River's Health Care Unit, which said that Anderson had no known allergies on file. (*Id.* ¶ 101.)

On April 29, Anderson asked the duty nurse on sick call why Peters had said that Anderson had no known allergies to the Meal Mart shelf-stable meals and why Peters was unaware that Anderson "was not being provided with a nutritionally sufficient diet." (*Id.* ¶ 102.) The nurse told Anderson to contact Meaker, Illinois River's Health Care Unit Administrator. (*Id.* ¶¶ 17, 103.) On May 2, Anderson sent an inmate request form to Meaker. (*Id.* ¶ 104.) In the form, Anderson "explained his history of suspected allergic reactions to the Meal Mart 'shelf-stable' meals and that he had been informed by medical personnel not to consume the meals." (*Id.*) Anderson also asked "why, if he had been informed not to eat the meals, an allergy had not been documented in his file so as to alert the dietary program to provide him with an alternative, nutritionally sufficient diet." (*Id.*) As of December 15, 2021, Meaker had not responded to Anderson or provided any relief to him, such as allergy testing or a modification to his kosher meals. (*Id.* ¶¶ 105, 144.)

Anderson alleges upon information and belief that Clark became Illinois River's day-to-day warden in late April or early May 2021. (*Id.* ¶ 106.) In this position, Clark is responsible for all of Illinois River's operations, including medical services and the Food Service Program. (*Id.* ¶ 16.) Anderson further alleges upon information and belief that Clark "is or should be aware of [his] suspected allergy to the Meal Mart 'shelf-stable' meals, his suspected allergic reaction to eating those meals," and Illinois River's failure to provide Anderson with a nutritionally sufficient diet. (*Id.* ¶ 107.) According to Anderson, Clark has or should have this awareness based on Anderson's prior communications with Hinthorne, Bordner, Peters, and Meaker. (*Id.*)

7

Since arriving at Illinois River, Anderson's daily diet generally consists of dry cereal, bread (or crackers), peanut butter, jelly, and one piece of fruit for breakfast; lettuce, bread (or crackers), and one piece of fruit for lunch; and lettuce, bread (or crackers), and one piece of fruit for dinner. (*Id.* ¶ 109.) He does not regularly receive a daily serving of tuna fish like he did for his last two years at JTC. (*Id.* ¶¶ 57, 108.) The only means by which inmates can obtain food "other than that provided through [Illinois River's] meal programs" is by purchasing food from the prison's commissary. (*Id.* ¶ 111.) But "due to conditions previously imposed on his confinement at Illinois River, Anderson has, at times, been highly limited" in his ability to buy food from the commissary to supplement his diet. (*Id.* ¶¶ 110, 112.)

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, we accept as true all well-pleaded facts in the plaintiff's complaint and draw all reasonable inferences in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "If the well-pleaded allegations plausibly suggest—as opposed to possibly suggest—that the plaintiff[] [is] entitled to relief, the case enters discovery." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019).

## ANALYSIS

Clark and Meaker moved to dismiss the First Amended Complaint, but Anderson filed two amended complaints while we were considering these motions. The Third Amended Complaint (not the First Amended Complaint) now governs this case. Because a "new complaint wipes away prior pleadings," *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999), we could have denied Clark's and Meaker's motions as moot in light of either the Second Amended Complaint or Third Amended Complaint. *See, e.g., McCarragher v. Ditton*, No. 14 C 08591, 2017 WL 2180436, at *2 (N.D. Ill. May 18, 2017) (the defendant's fully briefed motion to dismiss the original complaint became moot when the court granted the plaintiff leave to amend the complaint). However, we previously decided to "treat Clark's and Meaker's motions to dismiss as if they were filed in response to the Second Amended Complaint" in light of Anderson's "representation that his proposed amendments to the amended complaint 'do not affect the allegations against nor the relief sought from Defendants Clark or Meaker.'" (Dkt. No. 60 (quoting Dkt. No. 58 at 8).) Anderson made a similar representation when he sought leave to file his Third Amended Complaint (*see* Dkt. No. 85 ¶ 19), which neither Clark nor Meaker disputed. Therefore, we proceed as if Clark and Meaker filed their motions to dismiss in response to the Third Amended Complaint.

Anderson alleges that Clark, in her official capacity as Illinois River's warden, violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, Anderson's right to freely exercise his religion under the First Amendment, and his right to receive nutritionally adequate food under the Eighth Amendment. (3AC at 1 & ¶¶ 113–37 (Counts I, II, & III).) Anderson alleges that Meaker, in her official capacity as Illinois River's Health Care Unit Administrator, has been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (*Id.* at 1 & ¶¶ 138–44 (Count IV).) Anderson brings his

9

First Amendment and Eighth Amendment claims against Clark and Meaker under 42 U.S.C. § 1983 (*id.* ¶ 4), which is "the vehicle for bringing claims under the Constitution," *Harris v. City of Chicago*, No. 1:20-CV-00452, 2021 WL 1192438, at *5 (N.D. Ill. Mar. 30, 2021).

I.   **Clark's Motion to Dismiss**

Clark moves to dismiss Anderson's RLUIPA and First Amendment claims against her. RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721, 125 S. Ct. 2113, 2122 (2005). To that end, RLUIPA prohibits a state prison "from taking any action that substantially burdens the religious exercise of an institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest." *Holt v. Hobbs*, 574 U.S. 352, 356, 135 S. Ct. 853, 859 (2015); *Jones v. Carter*, 915 F.3d 1147, 1148–49 (7th Cir. 2019). The First Amendment's Free Exercise Clause, as applied to the states through the Fourteenth Amendment, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021), similarly prohibits the state from placing, without justification, "a substantial burden on [a prisoner's] religious practices," *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (quotation marks omitted).

In the RLUIPA context, actions that cause a prisoner to "seriously violate[] [his] religious beliefs" meet the "substantial burden" standard. *Holt*, 574 U.S. at 361, 135 S. Ct. at 862 (second alteration in original) (quotation marks omitted); *West v. Grams*, 607 F. App'x 561, 566–67 (7th Cir. 2015) ("The correct standard [for an RLUIPA claim] . . . is whether a particular restriction 'seriously' violates or contradicts an inmate's religious beliefs."). In the First Amendment context, "a substantial burden is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Neely-Bey Tarik-El*, 912 F.3d at 1003 (alteration in original)

10

(quotation marks omitted). These two standards, though phrased slightly differently, are similar, and both parties treat them as the same. (*See, e.g.*, Clark Mot. at 3; Opp'n to Clark Mot. at 5 n.1.) Therefore, for purposes of Clark's motion, we assume that a substantial burden under RLUIPA is the same as a substantial burden under the First Amendment. *See Robbins v. Robertson*, 782 F. App'x 794, 802 n.5 (11th Cir. 2019) (assuming, without deciding, that the same definition of "substantial burden" applied to the plaintiff's RLUIPA and First Amendment claims because the parties encouraged the court to do so).

Clark argues that we must dismiss Anderson's RLUIPA and First Amendment claims against her because Anderson has not pled that Clark placed a substantial burden on his freedom to exercise his religious beliefs by keeping a kosher diet. (Clark Mot. at 2–3.) As Clark sees it, she is not doing anything to burden Anderson's ability to maintain a kosher diet; instead, it is Anderson's own physical reactions that are burdening this ability. (*E.g.*, *id.* at 3 ("Plaintiff does not allege any obstacle *caused by Defendants* that prevent him from practicing his religion . . . . The only obstacle preventing Plaintiff from practicing his religion is his own undiagnosed allergy to shelf-stable meals.").) Thus, according to Clark, "this is a medical issue, not a religious issue," as Anderson has simply alleged that his medical condition prevents him from eating the food Clark provides to him. (*Id.* at 4–5.)

Clark's attempt to recharacterize Anderson's claim as solely a medical issue is not persuasive. "[A]dverse health effects from a prison diet can be relevant to the substantial burden inquiry." *Shakur v. Schriro*, 514 F.3d 878, 888–89 (9th Cir. 2008) (addressing a RLUIPA claim where the prisoner received a vegetarian diet that, while compliant with his religious beliefs, exacerbated his hiatal hernia and caused excessive gas). Although Anderson's physical reactions

11

to the Meal Mart shelf-stable foods may add an extra element into the mix, it does not negate the ultimate religious nature of his complaint.

Consider the situation in *Jones*. In that case, the prison refused to provide the plaintiff, an inmate whose religious beliefs required him to regularly eat halal meat, with meals that included halal meat. 915 F.3d at 1148. The plaintiff could have bought halal meat at the commissary, but doing so would have required him to "zero out his account and forgo purchasing other items such as hygiene products or over-the-counter medicine." *Id.* at 1150.

Viewing *Jones* as Clark views the situation here, one would say the issue was financial, not religious. After all, halal meat was available at the commissary; the plaintiff just could not buy this food on a regular basis because of his lack of financial resources. And indeed, the defendant in *Jones* argued that because the inmate could have purchased halal meat at the commissary, his lack of meat was merely "the result of 'his own spending choices[.]'" *Id.* at 1149. The Seventh Circuit, however, rejected this argument and found that the plaintiff's desire to eat halal meat was substantially burdened. *Id.* at 1150. Similarly, kosher food is available to Anderson, but he cannot eat it because of the physical reactions that occur when he does. Just as the plaintiff in *Jones* was not, "uniquely among all inmates," required "to give away his last dime so that his daily meals [would] not violate his religious practice," *id.*, we do not believe that Anderson, "uniquely among all inmates," must endure painful physical reactions just so he can keep a daily diet that complies with his religious beliefs.

Ultimately, as alleged in the Third Amended Complaint, Clark's failure to provide Anderson with kosher meals other than the Meal Mart shelf-stable meals forces him to make one of three choices. First, he can eat non-kosher meals, thereby violating his sincerely held religious beliefs. (*See* 3AC ¶¶ 18, 19.) Second, he can eat the Meal Mart shelf-stable meals and

12

deal with the accompanying "pain, discomfort, swelling, and trouble breathing." (*Id.* ¶ 139.) Third, he can forgo both non-kosher meals and Meal Mart shelf-stable meals and subsist on a nutritionally deficient daily diet—one that consists primarily of lettuce, bread (or crackers), and a few pieces of fruit, supplemented at times by purchases from the commissary. (*See, e.g.*, *id.* ¶¶ 109–12, 117, 119–22, 128.)

This is "precisely the type of pressure that substantially burdens the free exercise of [Anderson's] religious practice." *Rains v. Washington*, No. 2:20-cv-32, 2020 WL 1815839, at *1–2, *8 (W.D. Mich. Apr. 10, 2020) (addressing similar allegations by the plaintiff, a practicing Muslim prisoner, about the defendants' failure to accommodate his soy allergy by providing him with a nutritionally adequate halal meal that does not contain soy); *see also Davis v. Harper*, No. 18-cv-1119-SMY, 2018 WL 4409955, at *1–2 (S.D. Ill. Sept. 17, 2018) (allowing an inmate's First Amendment free exercise of religion claim to proceed where he alleged that the defendants accommodated his religious diet by serving food to which he had a documented allergy). If Anderson wants to exercise his religious beliefs by adhering to a kosher diet, he must either eat an inadequately nutritious diet or suffer significant physical reactions that often require medical assistance. Given that an inmate faced with only the first option is substantially burdened, *see Jones*, 915 F.3d at 1150, the additional availability of the second option, which similarly harms the inmate, does not in any way alleviate the burden he faces. *See Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (substantial burden exists when the plaintiff is presented with "an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise").

Courts must "take religious claimants as we find them." *Id.* For most of the inmates at Illinois River who desire to eat kosher, the Meal Mart shelf-stable kosher meals may be

13

adequate. But, accepting Anderson's allegations as true, they are not for Anderson. Anderson has plausibly alleged that Clark's failure to provide kosher meals to which Anderson is not allergic substantially burdens his religious beliefs. We therefore deny Clark's motion to dismiss.

## II.     Meaker's Motion to Dismiss

Meaker moves to dismiss Anderson's only claim against her, which alleges that she violated Anderson's Eighth Amendment rights by being deliberately indifferent to his serious medical needs. "The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, to provide adequate medical care to incarcerated individuals." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quotation marks omitted). A prison official violates this duty if (1) the inmate has an objectively serious medical condition; and (2) the official is "deliberately indifferent to that condition." *See id.*; *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). Meaker only argues that Anderson has failed to allege the second, subjective element,[2] so we do not say anything more about the first, objective element.

To adequately plead the subjective element of a deliberate indifference claim, Anderson must allege that Meaker "acted with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751–52 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)). This requires factual allegations that, taken as true, make it plausible that Meaker knew of and disregarded an excessive risk to Anderson's health or safety or that Meaker was "both aware of facts from which the inference

---

[2] In a footnote, Meaker says that "[i]t is also unclear how Plaintiff would be able to exhaust his administrative remedies under the" Prison Litigation Reform Act, but she does so without further explanation. (Meaker Mot. at 3 n.1.) To the extent Meaker intended to raise a failure-to-exhaust argument, we do not consider it. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived[.]").

14

could be drawn that a substantial risk of serious harm exists," and she drew that inference. *See Johnson*, 5 F.4th at 825 (quotation marks omitted).

With this framework in place, we turn to Anderson's allegations regarding Meaker. According to Anderson, he sent an inmate request form to Meaker, Illinois River's Health Care Unit Administrator, on May 2, 2021. (3AC ¶¶ 17, 104.) In the form, Anderson "explained his history of suspected allergic reactions to the Meal Mart 'shelf-stable' meals and that he had been informed by medical personnel not to consume the meals." (*Id.* ¶ 104.) Anderson also asked "why, if he had been informed not to eat the meals, an allergy had not been documented in his file so as to alert the dietary program to provide him with an alternative, nutritionally sufficient diet." (*Id.*) As of December 15, 2021, Meaker had not responded to Anderson. (*Id.* ¶ 105.) Nor had Anderson received any allergy testing or any other modification to his kosher meals by this time. (*Id.*) Despite her awareness of Anderson's reactions to the Meal Mart shelf-stable meals, Meaker has failed to provide him with any relief. (*Id.* ¶¶ 143, 144.)

Meaker first contends that Anderson has not alleged that she received the May 2 inmate request form. (Meaker Mot. at 3.) But "[w]e must assume that letters sent through a prison mail system were received by the addressee." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 767 (7th Cir. 2021); *see also Vincent v. City Colls. of Chi.*, 485 F.3d 919, 922 (7th Cir. 2007) ("Evidence of mailing is evidence of delivery."). So, although Anderson does not specifically allege that Meaker received the May 2 inmate request form, we can reasonably infer that she did. We can also reasonably infer that Meaker became aware of Anderson's condition when she received the form, which "explained [Anderson's] history of suspected allergic reactions to the Meal Mart 'shelf-stable' meals" and indicated that Anderson was not being provided with "an alternative, nutritionally sufficient diet." (3AC ¶ 104.) And Meaker does not argue otherwise.

15

Meaker does argue, however, that Anderson's allegations do not allow us to reasonably infer that she received the May 2 inmate request form *by May 5, 2021*. (Meaker Mot. at 3–4.) Anderson counters that "it is just as likely that [Meaker] received [the form] the day it was sent or the day after." (Opp'n to Meaker Mot. at 7.) The parties focus on the precise day when Meaker received the May 2 inmate request form because the operative complaint when the parties filed their briefs was the Amended Complaint, which Anderson filed on May 5, 2021. The Amended Complaint alleged that "Anderson has not received any response from Meeker [sic], any allergy testing, or any other modification to his kosher meals at Illinois River" "[a]s of the filing of this Amended Complaint," i.e., May 5, 2021. (Amended Complaint (Dkt. No. 12) ¶ 111.) Consequently, Anderson's theory was that Meaker's failure to respond by May 5—three days after he submitted the inmate request form—plausibly established deliberate indifference. (*See* Opp'n to Meaker Mot. at 6 (arguing that a delay in treatment of a few days can constitute deliberate indifference).)

We do not need to consider the merits of this theory in view of the now-operative Third Amended Complaint. Paragraph 105 of the Third Amended Complaint alleges that "Anderson has not received any response from Meaker, any allergy testing, or any other modification to his kosher meals at Illinois River" "[a]s of the filing of this Amended Complaint," i.e., December 15, 2021. (3AC ¶ 105.) Even if we do not know precisely when Meaker received the May 2 inmate request form, we can reasonably infer that she received the form sometime in May 2021. *See Bobbitt v. Freeman Cos.*, 268 F.3d 535, 538 (7th Cir. 2001) ("The law presumes timely delivery of a properly addressed piece of mail."). With this reasonable inference, the Third Amended Complaint alleges that despite learning about Anderson's suspected allergy to Meal

16

Mart shelf-stable foods and his inability to eat a nutritionally sufficient diet sometime in May 2021, Meaker has not responded or provided Anderson with relief for more than six months.[3]

Anderson's allegations plausibly suggest that Meaker acted with deliberate indifference. An "'inexplicable delay in treatment [that] serves no penological interest' can support a finding of deliberate indifference." *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021) (quoting *Petties*, 836 F.3d at 730). To determine whether a delay in treatment reflects deliberate indifference, "we ask how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain." *Id.* at 769. "Delay need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted." *Id.* "Even a delay of less than a week may be the result of deliberate indifference." *Id.*

Here, Anderson's inability to eat a nutritionally sufficient diet day in and day out has resulted in significant weight loss, fatigue, leg numbness, and mood swings. (3AC ¶¶ 83–85.) It is also reasonable to infer that subsisting on lettuce, bread, cereal, peanut butter, jelly, and fruit (*see id.* ¶ 109) has resulted in hunger and malnutrition. In short, Anderson's diet is a serious

---

[3] The text of paragraph 105 of the Third Amended Complaint is identical to the text of paragraph 116 of the Second Amended Complaint and paragraph 111 of the Amended Complaint. However, because the allegations in these paragraphs refer to when Anderson filed each respective complaint, the substance of the allegations differs from complaint to complaint. As noted, Meaker's motion to dismiss addressed the First Amended Complaint, which alleged in paragraph 111 that she failed to respond for, at most, three days. But in the Second Amended Complaint, this allegation (now found in paragraph 116) alleged that Meaker had failed to respond by September 16, 2021, the filing date of the Second Amended Complaint. (Second Amended Complaint (Dkt. No. 61) ¶ 116.) Given this substantive change, we gave Meaker the opportunity to file a supplemental brief addressing paragraph 116 of the Second Amended Complaint as it pertained to her motion to dismiss. (Dkt. No. 74.) She did not do so. Because Meaker declined to address whether her alleged failure to respond by September 16 supported a deliberate indifference claim, we deem it unnecessary to give Meaker the opportunity to address whether an even longer delay supports a deliberate indifference claim.

problem. It is also one that, as far as we can tell at this stage of the proceedings, could have been easily remedied by providing Anderson with alternative kosher meals to which he did not experience the suspected allergic reactions. (*See id.* ¶ 24 (alleging that there are prepared kosher meals that Anderson can eat without experiencing an allergic reaction).) At the very least, Meaker could have responded to Anderson and explained why an allergy had not been documented in his file or why he could not be provided with an alternative kosher meal. Yet, more than six months after learning about Anderson's inability to eat a nutritionally sufficient diet, Meaker still had not taken any action to address it. (*See id.* ¶¶ 105, 144.) This suffices to plausibly state a deliberate indifference claim against Meaker. *See, e.g.*, *Thomas*, 991 F.3d at 767, 769–70 (doctor's five-month failure to respond to a request for a low-bunk permit precluded summary judgment on deliberate indifference claim); *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012) (prisoner stated a deliberate indifference claim by alleging "a serious, readily treatable condition that was ignored for almost a week"). Accordingly, we deny Meaker's motion to dismiss as well.

## CONCLUSION

For the foregoing reasons, we deny Meaker's motion to dismiss (Dkt. No. 33) and Clark's motion to dismiss (Dkt. No. 34). Meaker and Clark shall answer the Third Amended Complaint by January 13, 2022. It is so ordered.

*Marvin E. Aspen*

Marvin E. Aspen
United States District Judge

Dated: December 16, 2021