**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MARK ANDERSON,                    )
                                  )
            Plaintiff,            )
                                  )        No. 21-cv-944
      v.                          )
                                  )        Judge Marvin E. Aspen
DR. CATHERINE LARRY et al.,       )
                                  )
            Defendants.           )

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Mark Anderson, who is Jewish, alleges that prison officials and medical

personnel did not adequately address and accommodate his allergy to the kosher meals he was

provided while he was a prisoner in the custody of the Illinois Department of Corrections

("IDOC").  He asserts a claim under the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and constitutional claims under 42 U.S.C. § 1983.

Defendants Dr. Catherine Larry, Dr. Thenesia Williams, Dr. Lamenta Conway, Mindi Nurse,

Tiffanie Clark, and Jennifer Meaker (collectively, the "IDOC Defendants") move for summary

judgment, arguing that Anderson did not exhaust his administrative remedies before filing suit.

(Defendants' Motion for Summary Judgment Based on Exhaustion ("IDOC Mot.") (Dkt. No.

111); Defendants' Memorandum of Law in Support of Motion for Summary Judgment Based on

Exhaustion ("IDOC Mem.") (Dkt. No. 113).)[1]  Defendant Dr. Kul B. Sood separately moves for

summary judgment on exhaustion grounds as well.  (Defendant's Fed. R. Civ. P. 56 Motion for

Summary Judgment Pursuant to 42 U.S.C. § 1997e(a) ("Sood Mot.") (Dkt. No. 114).)  For the

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless
citing to a particular paragraph or other page designation is more appropriate.

following reasons, we grant the IDOC Defendants' motion in part and deny it in part, and we grant Dr. Sood's motion.

## BACKGROUND

We take the following background from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case as appropriate. Unless otherwise noted, all facts are not genuinely disputed.

### I.     The Parties

#### A.     The Plaintiff

Anderson was a prisoner in IDOC's custody for roughly 18 years. (IDOC Resp. to Pl. SOAF ¶ 2; Sood Resp. to Pl. SOAF ¶ 2.) Relevant here, Anderson was housed at Joliet Treatment Center ("JTC") from December 2017 until April 5, 2021, when he was transferred to Illinois River Correctional Facility ("Illinois River"). (Pl. Resp. to IDOC SOF ¶¶ 19, 20.) On December 16, 2021, he was released from Illinois River on parole. (IDOC Resp. to Pl. SOAF ¶ 2; Sood Resp. to Pl. SOAF ¶ 2; Dkt. No. 120-2.)

---

[2] See Defendants' Local Rule 56.1(a)(2) Statement of Material Facts ("IDOC SOF") (Dkt. No. 112); Defendant Dr. Kul B. Sood, M.D.'s Rule 56.1 Statement of Facts in Support of His Motion for Summary Judgment Pursuant to 42 U.S.C. § 1997e(a) ("Sood SOF") (Dkt. No. 115); Plaintiff's Responses to IDOC Defendants' Statement of Material Facts ("Pl. Resp. to IDOC SOF") (Dkt. No. 119) at 1–6; Plaintiff's Responses to Dr. Sood's Statement of Material Facts ("Pl. Resp. to Sood SOF") (Dkt. No. 119) at 6–13; Plaintiff's Statement of Additional Undisputed Facts ("Pl. SOAF") (Dkt. No. 119) at 13–20; IDOC Defendants' Responses to Plaintiff's Statement of Additional Facts ("IDOC Resp. to Pl. SOAF") (Dkt. No. 120) at 1–12; Kul B. Sood, M.D.'s Response to Plaintiff's Statement of Additional Undisputed Facts ("Sood Resp. to Pl. SOAF") (Dkt. No. 121); Defendant Dr. Kul B. Sood M.D.'s Rule 56.1 Supplemental Statement of Facts in Support of His Motion for Summary Judgment Pursuant to 42 U.S.C. Section 1997 ("Sood Suppl. SOF") (Dkt. No. 137); Plaintiff's Response to Defendant Dr. Kul B. Sood M.D.'s Rule 56.1 Supplemental Statement of Facts ("Pl. Resp. to Sood Suppl. SOF") (Dkt. No. 141) at 1–18; Plaintiff's Supplemental Statement of Additional Undisputed Facts ("Pl. Suppl. SOAF") (Dkt. No. 141) at 18–20; Dr. Sood's Response to Plaintiff's Supplemental Statement of Additional Undisputed Facts ("Sood Resp. to Pl. Suppl. SOAF") (Dkt. No. 143).

Anderson has observed Judaism since he was a child, and he adheres to kosher dietary law. (IDOC Resp. to Pl. SOAF ¶¶ 3–5; Sood Resp. to Pl. SOAF ¶¶ 3–5.) While incarcerated, he sought and was admitted to the kosher meal program at every IDOC facility where he was housed. (IDOC Resp. to Pl. SOAF ¶ 5; Sood Resp. to Pl. SOAF ¶ 5.) According to Anderson, JTC and Illinois River served a certain brand of pre-packaged kosher meals (the "Meal Mart shelf-stable meals") for lunch and dinner as part of their kosher meal programs; however, he could not safely eat these meals because he was allergic to them. (*E.g.*, Third Amended Complaint ("3AC") (Dkt. No. 95) ¶¶ 1, 32–34, 91, 96, 97, 117.) Anderson further alleges that because the Meal Mart shelf-stable meals contained a large portion of the calories provided to him on a daily basis, his inability to safely eat these meals meant that he could not consume sufficient daily calories while also complying with his religious beliefs. (*E.g.*, *id.* ¶¶ 2, 42–44, 117, 132–34.)

## B. The Defendants

Dr. Larry is JTC's warden. (Pl. Resp. to IDOC SOF ¶ 6.) In this role, Dr. Larry oversees all operations at JTC by supervising her two assistant wardens. (Dkt. No. 141-1 at 2 (Larry Answer to Pl. Interrog. No. 2).) Before becoming JTC's warden in February 2020, Dr. Larry worked at a different IDOC facility in Elgin. (Pl. Resp. to IDOC SOF ¶¶ 6, 7.) Anderson alleges that despite knowing in mid- to late-2020 that he could not eat the Meal Mart shelf-stable meals, Dr. Larry failed to provide him with a nutritionally sufficient kosher diet that he could safely consume. (*E.g.*, 3AC ¶¶ 70–72, 119–21, 125, 126, 136, 137.)

As JTC's assistant warden of operations ("AWO"), Nurse oversees and supervises JTC's dietary unit. (Pl. Resp. to IDOC SOF ¶¶ 9, 11.) Before becoming JTC's AWO in January 2020, Nurse worked as a senior security supervisor at JTC. (*Id.* ¶¶ 9, 10.) As a senior security supervisor, Nurse had no role or responsibilities regarding JTC's dietary unit, including any role

or responsibility related to the issuance of kosher meals. (*Id.* ¶ 12.) Anderson alleges that Nurse was aware that he could not eat the Meal Mart shelf-stable meals and failed to provide him with a nutritionally sufficient kosher diet that he could safely consume. (*E.g.*, 3AC ¶¶ 119–21, 125, 126, 136, 137.) In particular, Anderson alleges that Nurse did nothing to modify Anderson's diet even after she witnessed the full extent of his allergic reaction to a Meal Mart shelf-stable meal in January 2021. (*Id.* ¶¶ 79–82.)

Dr. Williams is JTC's assistant warden of programs ("AWP"). (Pl. Resp. to IDOC SOF ¶ 13.) She does not oversee and is not otherwise involved with the operations of JTC's dietary unit, as that is within the purview of JTC's AWO. (*Id.* ¶ 15.) Dr. Williams did not work at JTC before becoming JTC's AWP in January 2020. (*Id.* ¶¶ 13, 14.) Anderson alleges that Dr. Williams was aware that he could not eat the Meal Mart shelf-stable meals and failed to provide him with a nutritionally sufficient kosher diet that he could safely consume. (*E.g.*, 3AC ¶¶ 119–21, 125, 126, 136, 137.) Anderson also alleges that in late 2020, Dr. Williams did not take any action to have him evaluated for his suspected allergy to the Meal Mart shelf-stable meals or to have his diet altered to accommodate this allergy even though she knew that JTC personnel had denied Anderson the opportunity to be tested for the allergy. (*Id.* ¶¶ 70–75.)

Dr. Conway is IDOC's Deputy Chief of Health Services. (Declaration of Dr. Lamenta Conway ("Conway Decl.") (Dkt. No. 124) ¶ 2.) She began working for IDOC in September 2019. (*Id.* ¶ 3; Pl. Resp. to IDOC SOF ¶ 3.) Before working for IDOC, Dr. Conway worked for the Hines VA. (Conway Decl. ¶ 4; Pl. Resp. to IDOC SOF ¶ 3.) Anderson alleges that Dr. Conway did not order an allergy test for him despite knowing his history of suspected allergic reactions to the Meal Mart shelf-stable meals since September 2020. (3AC ¶¶ 66–69, 143, 144.)

Clark is Illinois River's day-to-day warden. (Pl. Resp. to IDOC SOF ¶ 5.) In this position, she oversees security staff for the entire facility, supervises the AWP and the AWO, and has administrative responsibilities. (Dkt. No. 141-3 at 2 (Clark Answer to Pl. Interrog. No. 2).) Clark served as Illinois River's AWP from April 2020 until she became the day-to-day warden on May 1, 2021. (*Id.*) In her role as AWP, Clark did not oversee the dietary unit. (*Id.*) Anderson alleges that Clark was aware that he could not eat the Meal Mart shelf-stable meals and failed to provide him with a nutritionally sufficient kosher diet that he could safely consume. (*E.g.*, 3AC ¶¶ 107, 119–21, 125, 126, 136, 137.)

Meaker has been Illinois River's Health Care Unit Administrator since September 2017. (Pl. Resp. to IDOC SOF ¶ 4; Dkt. No. 141-4 at 2 (Meaker Answer to Pl. Interrog. No. 2).) In this position, Meaker oversees and supervises Illinois River's contract with Wexford Health Sources, Inc. ("Wexford") and ensures that Wexford is fulfilling its contractual duties.[3] (Dkt. No. 141-4 at 2 (Meaker Answer to Pl. Interrog. No. 2); Sood Resp. to Pl. Suppl. SOAF ¶ 4.) She is not directly involved with the dietary unit, including the issuance of kosher meals. (Dkt. No. 141-4 at 2 (Meaker Answer to Pl. Interrog. No. 2).) Anderson alleges that Meaker has failed to do anything to address his suspected allergic reactions to the Meal Mart shelf-stable meals despite knowing about them since May 2021. (3AC ¶¶ 104, 105, 143, 144.)

Dr. Sood was employed by Wexford. (Pl. Resp. to Sood SOF ¶ 2.) Anderson alleges that Dr. Sood saw him in December 2018 and became aware of his allergic reactions to the Meal Mart shelf-stable meals yet failed to order an allergy test to confirm the allergy or note in Anderson's file that he should receive a substitute for the Meal Mart shelf-stable meals. (3AC ¶¶ 49–51, 143, 144.)

---

[3] Wexford contracts with IDOC to provide medical care and treatment to inmates at JTC and Illinois River. (Pl. Resp. to Sood SOF ¶ 2.)

## II.     Anderson's Grievances

From January 2018 (when he was housed at JTC) until he was discharged from Illinois River in December 2021, Anderson was able to file grievances. (Pl. Resp. to IDOC SOF ¶ 19; Dkt. No. 120-2; Dkt. No. 136-1 at 3–4 (Pl. Resps. to Williams RFA Nos. 2, 4).) Anderson filed twenty-two grievances during this time frame, sometimes filing multiple grievances in the same month (or even on the same day). He filed grievances in October 2018, January 2019, April 2019, June 2019, July 2019, August 2019, September 2019, October 2019, July 2020, August 2020, September 2020, November 2020, and December 2020 while at JTC, and in May 2021, June 2021, and November 2021 while at Illinois River. (Pl. Resp. to IDOC SOF ¶¶ 22, 30, 31; Pl. Resp. to Sood Suppl. SOF ¶¶ 2, 4, 6, 8, 10, 12, 14, 16, 18, 19, 21, 23, 25, 27, 29, 32; Dkt. No. 136-1 at 3–6, 9–12, 14 (Pl. Resps. to Williams RFA Nos. 1, 5, 7–9, 11, 20–22, 24, 25, 30, 31, 36; Dkt. No. 136-2).) Although Anderson asserts that he was required for some time at JTC to first meet with a counselor before he could file a grievance, which could take weeks, he does not say when this requirement was in place. (Dkt. No. 136-1 at 4 (Pl. Resp. to Williams RFA No. 4).) Nor does Anderson identify any time frames during which he did not have access to grievance forms. (*Id.* at 17–18 (Pl. Resp. to Williams Interrog. Nos. 1–3).)

During discovery on the exhaustion issue, Anderson identified two grievances that he says exhausted his administrative remedies as it pertains to this lawsuit: (1) Grievance No. 37.10.18, dated October 16, 2018 (the "October 2018 Grievance"); and (2) Grievance No. 59.04.19, dated April 15, 2019 (the "April 2019 Grievance"). (Dkt. No. 115-2 at 2–5 (Pl. Resp. to IDOC Interrog. No. 10).) Consequently, the parties have focused their arguments on whether these two grievances properly exhausted Anderson's remedies with respect to his claims in this case. (*See, e.g.*, IDOC Mem. at 1; Sood Mot. at 2; Plaintiff Mark Anderson's Response to Motions for Summary Judgment on Exhaustion ("Pl. Opp'n") (Dkt. No. 118) at 6–8; *see also* Pl.

Resp. to IDOC SOF ¶ 22 (admission by Anderson that he filed two grievances related to this lawsuit: the October 2018 Grievance and the April 2019 Grievance).)

### A.     The October 2018 Grievance

Anderson identified the nature of the October 2018 Grievance as "Dietary." (October 2018 Grievance (Dkt. No. 115-3) at 1.) The grievance's summary section states, in relevant part, as follows:

> It has been 12 days since I have had a complete meal. Please let me explain. I started the Kosher diet as mandated by my Jewish faith on October 1, 2018. When I first arrived at JTC I had asked about a Kosher diet and was told that one was not offered. Since that time I began to prepare a legal case to have JTC comply with State and Federal laws in providing a religious diet. During the research of the legal case I discovered JTC did provide a Kosher diet for Jewish residents. I immediately filled out the Offender Request for Religious Diet form (DOC 0388) and the Chaplain's Interview worksheet attached to the form.
>
> I have some sort of reaction to eating the Meal Mart Kosher trays that dietary serves. No matter which of the 5 meals I eat, my throat swells and I have difficulty swallowing for a period of time (typically 45 mins. to an hour). I have been to nurse sick call 3 times, Oct. 4th, Oct. 7th, and Oct. 8th. It was determined that I may have a reaction or allergic reaction to either the packaging or preservative used to keep the meat and fish good for 3+ years. I was advised not to eat the Meal Mart Kosher trays to prevent the possibility of going into anaphylactic shock if I had indeed developed an allergy to something contained in the Meal Mart Kosher trays. I notified Dietary Manager Buckley on October 9th in person of Health Care's recommendation. I also explained to DM Buckley that I had the same issue when I was in Pinckneyville C.C. with the same Meal Mart Kosher trays. Pinckneyville procured different Kosher trays for a period of time. The other kosher brands were Spring Valley and Religious Meals. I had no idea what distributor they used or how they obtained them. I did how ever give DM Buckley the dietary manager's name and the name of the chaplain that I dealt with at Pinckneyville. I did not have any adverse reactions to either of the other Kosher brands, Spring Valley or Religious Meals.
>
> *       *       *

> DM Buckley mentioned that shelf stable is preferred due to space restrictions, so Religious Meals Kosher trays would be preferred. There may be another distributor that is closer or one that already deals with IDOC that can procure Religious Meals brand of Kosher trays, which I would not know and my family could not find on the internet. I just thought to do a little leg work to attempt to find a solution.
>
> At this time Commissary is not an option, what little Kosher items they carry, they have been out of for the past 3 weeks. There is no Rice, Beans, Mackeral, Mixed Peanuts, and Potatoe Chip. Items like Noodles, Cheese, Summer Sausage, and other meat packages are not Kosher. Even though Food Express has Kosher items of the fore mentioned, our commissary does not carry those brands.
>
> The only things I am able to eat off of the Kosher dietary trays provided are the complete breakfast tray, which is cereal, a piece of fruit, and a bagel. As far as the lunch and dinner trays, I am able to eat the piece of fruit and the lettuce. This is all that I have had in the past 12 days, 13 including today. It is only about 600–700 calories a day. My health is deteriorating because of this.

(*Id.* at 1–2 (spelling, punctuation, and capitalization as in original); Pl. Resp. to Sood SOF ¶ 5.) As relief, the October 2018 Grievance requests that Anderson be provided with kosher food that he can "eat without having a reaction." (October 2018 Grievance at 1.) The grievance does not name or describe any IDOC Defendant. (Pl. Resp. to IDOC SOF ¶ 24.) Nor does it list any specific wrongdoing by any IDOC Defendant. (*Id.* ¶ 25.)

The grievance officer who reviewed the October 2018 Grievance recommended that it be denied without further action. (Pl. Resp. to Sood SOF ¶ 7.) In the grievance officer's view, the issue raised by Anderson had been adequately addressed by the dietary manager, who had stated as follows: "We serve the same Kosher meals that every other institution has. I do not have an alternative. He also gets a tray with fruit, salad and a tortilla with lunch and dinner meals. He ate regular meals fine until he started the Kosher meals recently." (*Id.*) After the Chief Administrative Officer—Andrea Tack, JTC's warden before Dr. Larry—concurred with the

recommendation, Anderson appealed to the Administrative Review Board ("ARB"). (*Id.* ¶ 8; Pl. Resp. to IDOC SOF ¶ 8; Dkt. No. 115-4.) The ARB denied the grievance on the basis that the prison administration had appropriately addressed the issue. (Pl. Resp. to Sood SOF ¶ 9; Dkt. No. 115-5.) The ARB also indicated that Anderson was being given an extra tray with fruit and hard-boiled eggs. (Pl. Resp. to Sood SOF ¶ 9; Dkt. No. 115-5.)

### B. The April 2019 Grievance

Six months later, Anderson filed the April 2019 Grievance. Anderson identified the nature of this grievance as "Director of Nursing." (April 2019 Grievance (Dkt. No. 115-6) at 1.) The grievance's summary section states, in relevant part, as follows:

> On March 4, 2019, Warden Tack composed a letter to Rabbi Weiss at the Aleph Institute. I have been a member of the Aleph Institute since 2003 and recently they were inquiring about the issue I have been having with Meal Mart's Shelf Stable kosher meals. Accordingly, from Joliet Treatment Center's (JTC) Health Care Unit, I have "possible sensitivity to preservative in shelf stable kosher food tray." See attached medical records, specifically dated December 6, 2018.

> In preparing the letter to Rabbi wiess, Warden Tack was given incorrect information from the Director of Nursing. See highlighted section of the attached copied letter. He reported that there were "no noted symptoms documented . . ." See attached medical records, specifically dated December 5, 2018.

> What makes the December 5th health care visit different, was that the dietary lieutenant personally walked me to health care as soon as my throat began to tighten. No other time in the other 6–7 visits was I afforded the opportunity to go directly to health care. Instead, I would have to go back to the housing unit and wait to go go health care, which would sometimes take 2–3 hours. By that time the swelling had already subsided and it was impossible to view the symptoms. I have always recommended that I eat one of the shelf stable Meal Mart meals <u>IN</u> health care under supervision so the symptoms could be reviewed and recorded in real-time. Instead of going to health care after the symptoms have gone.

> Lastly, I had seem the doctor on December 17, 2018 pertaining to
> this issue.  His order was "to amid the food which is allergic."  See
> medical records, specifically dated December 17, 2018.
>
> I am sure the Director of Nursing somehow overlooked these
> records when he was compiling his report to Warden Tack.  I
> understand mistakes happen; however the Director of Nursing
> should correct the misinformation given to Warden Tack.

(*Id.* at 1–2 (spelling, punctuation, and capitalization as in original); Pl. Resp. to Sood SOF ¶ 10.)

As relief, the April 2019 Grievance requests acknowledgement of Anderson's "legitimate

symptoms regarding [his] adverse reactions to Meal Mart's shelf stable kosher meals" and that

the Director of Nursing report the correct information regarding these symptoms to the dietary

manager and the warden.  (April 2019 Grievance at 1.)  The grievance does not name or describe

any IDOC Defendant, nor does it list any specific wrongdoing by any of these defendants.  (Pl.

Resp. to IDOC SOF ¶¶ 24, 25.)

Because the April 2019 Grievance pertained to medical issues, it was forwarded to a

grievance officer, who then sent the grievance to the medical unit for its response.  (Pl. Resp. to

Sood SOF ¶ 11; Dkt. No. 115-7.)  After reviewing the information provided by the medical unit,

the grievance officer's recommendation was that "we are still awaiting" the healthcare unit's

recommendations.  (Dkt. No. 115-7.)  In December 2020, Dr. Larry concurred with the

determination in her role as Chief Administrative Officer.  (Pl. Resp. to Sood SOF ¶ 13; Dkt. No.

141-1 at 3 (Larry Answer to Pl. Interrog. No. 4).)  Anderson appealed, but the ARB refused to

consider the issue further because it received the appeal more than 30 days after Dr. Larry's

decision and there was no justification provided for additional consideration.  (Pl. Resp. to Sood

SOF ¶¶ 14, 15; Dkt. No. 115-8.)

### III.    Anderson's Lawsuit

In February 2021, while still an inmate at JTC, Anderson filed a *pro se* Complaint against Dr. Larry, Dr. Williams, and several other individuals who are no longer defendants in this case. (Dkt. No. 1 at 1; Pl. Resp. to IDOC SOF ¶¶ 1, 18, 19.)  We screened the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A(a) and allowed Anderson to proceed with certain claims.  (Dkt. No. 8.)  We also recruited counsel for Anderson.  (*Id.* at 1.)

Anderson's recruited counsel filed an Amended Complaint on May 5, 2021, about a month after Anderson was transferred to Illinois River.  (*See generally* Amended Complaint (Dkt. No. 12).)  The Amended Complaint kept Dr. Larry and Dr. Williams as defendants, and it named Nurse, Dr. Sood, Dr. Conway, Clark, and Meaker as defendants for the first time.  (*See id.* ¶¶ 9, 10, 13, 15, 16, 19, 20.)

The operative complaint is the Third Amended Complaint, which was filed on December 15, 2021—the day before Anderson was released on parole.  (*See generally* 3AC.)  The Third Amended Complaint asserts four counts.  Count I alleges that Dr. Larry, Dr. Williams, Nurse, and Clark violated RLUIPA by failing to provide Anderson with a nutritionally sufficient kosher diet that he can safely consume.  (*Id.* ¶¶ 113–22.)  Count II alleges that the same inaction by the same defendants violated Anderson's First Amendment right to freely exercise his religion.  (*Id.* ¶¶ 123–30.)  Count III alleges that the same defendants violated Anderson's Eighth Amendment right to adequate nutrition by refusing to modify his meal program or provide him with additional food.  (*Id.* ¶¶ 131–37.)  Finally, Count IV alleges that Dr. Sood, Dr. Conway, and Meaker violated Anderson's Eighth Amendment right to adequate medical care by being deliberately indifferent to his suspected allergic reactions to IDOC's kosher meals.  (*Id.* ¶¶ 138–44.)  Anderson brings his First Amendment and Eighth Amendment claims under 42 U.S.C.

§ 1983 (*id.* ¶ 4), which is "the vehicle for bringing claims under the Constitution," *Harris v. City of Chicago*, No. 1:20-CV-00452, 2021 WL 1192438, at *5 (N.D. Ill. Mar. 30, 2021).

In early February 2022, several defendants moved to stay non-exhaustion discovery. (Dkt. Nos. 102, 103.)  We granted these motions and set April 4, 2022, as the deadline for completing exhaustion discovery.  (Dkt. No. 104.)  Defendants then moved for summary judgment based on Anderson's alleged failure to exhaust his remedies, and the parties briefed the issue.  (*See generally* IDOC Mem.; Sood Mot.; Pl. Opp'n; IDOC Defendants' Reply in Support of Motion for Summary Judgment Based on Exhaustion ("IDOC Reply") (Dkt. No. 120); Kul B. Sood, M.D.'s Reply in Support of His Motion for Summary Judgment on the Basis of Plaintiff's Failure to Exhaust His Administrative Remedies ("Sood Reply") (Dkt. No. 122).)  After reviewing the parties' summary judgment briefing, however, we concluded that additional information and argument was necessary regarding the availability of administrative remedies during the relevant time frames.  (Dkt. No. 128.)  We allowed the parties to conduct additional discovery limited to this matter and ordered them to thereafter file supplemental briefs on the issue (*id.*), which they have done.  (*See* IDOC Defendants' Supplemental Brief in Support of Motion for Summary Judgment Based on Exhaustion ("IDOC Suppl. Br.") (Dkt. No. 136); Kul B. Sood, M.D.'s Supplemental Brief in Support of His Motion for Summary Judgment on the Basis of Plaintiff's Failure to Exhaust His Administrative Remedies ("Sood Suppl. Br.") (Dkt. No. 138); Plaintiff Mark Anderson's Supplemental Brief in Response to All Defendants' Motions for Summary Judgment Based on Exhaustion ("Pl. Suppl. Br.") (Dkt. No. 140).) Defendants' summary judgment motions are now ripe for decision.

## LEGAL STANDARD

Summary judgment is appropriate "where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d

1040, 1048 (7th Cir. 2019).  In determining whether to grant summary judgment, "we construe all facts in the light most favorable to the" non-moving party "and draw all reasonable inferences in that party's favor."  *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

The moving party bears the initial burden of demonstrating that summary judgment is appropriate.  *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).  When a defendant moves for summary judgment on an affirmative defense, this burden requires the defendant to "'lay out the elements of the [defense], cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant' on the defense."  *Harnishfeger v. United States*, 943 F.3d 1105, 1116 (7th Cir. 2019) (alterations in original) (quoting *Hotel 71 Mezz Lender*, 778 F.3d at 601).  If the defendant fails to make this initial showing, we must deny its motion for summary judgment.  *Hotel 71 Mezz Lender*, 778 F.3d at 601.

## ANALYSIS

Defendants contend that we should grant summary judgment in their favor because Anderson failed to properly exhaust his administrative remedies.  (IDOC Mem. at 1; Sood Mot. at 1.)  Anderson responds that his October 2018 and April 2019 Grievances exhausted his claims against each defendant under the continuing violation doctrine recognized by the Seventh Circuit in *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013).  (*E.g.*, Pl. Opp'n at 1, 2, 9, 10.)  All parties agree that we can resolve Defendants' motions without holding an evidentiary hearing under *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008).  (Sood Mot. at 6 n.1; Pl. Opp'n at 15; IDOC Reply at 12.)

Because Anderson was incarcerated when he filed his complaints in this lawsuit, his claims are governed by the Prison Litigation Reform Act ("PLRA").  *See Williams v. Ortiz*, 937

F.3d 936, 941 (7th Cir. 2019). "Under the PLRA, a prisoner must exhaust 'such administrative remedies as are available' before bringing a suit 'with respect to prison conditions under section 1983 . . . or any other federal law.'" *Id.* (quoting 42 U.S.C. § 1997e(a)). The contention that a prisoner has failed to exhaust his administrative remedies "is an affirmative defense that a defendant must establish by competent evidence." *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) (quotation marks omitted). To prove their failure-to-exhaust defense, Defendants must show that (1) an administrative remedy was available to Anderson and (2) that he failed to properly exhaust this remedy. *See id.*; *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). We address each element in turn.

## I. Were Administrative Remedies Available?

The PLRA's exhaustion requirement hinges on an administrative remedy being available to a prisoner. *Ross v. Blake*, 578 U.S. 632, 642 (2016). "An 'available' remedy is one that is 'capable of use for the accomplishment of a purpose' and 'is accessible or may be obtained.'" *Crouch*, 27 F.4th at 1320 (quoting *Ross*, 578 U.S. at 642). The remedy must be available during the relevant exhaustion period; if not, the exhaustion requirement does not apply in the first place, and the prisoner can immediately proceed in federal court. *See Hernandez v. Dart*, 814 F.3d 836, 840, 842 (7th Cir. 2016). The relevant exhaustion period is the time frame in which the prisoner could file a timely grievance. *Ramirez v. Young*, 906 F.3d 530, 539–40 (7th Cir. 2018) (prisoner did not need to satisfy the exhaustion requirement because administrative "remedies were not available to him at a time when he could have filed a timely grievance"); *Hernandez*, 814 F.3d at 842–43 (prisoner did not need to satisfy the exhaustion requirement with respect to his excessive force claim because administrative remedies were unavailable during the time frame the prisoner had to file his grievance regarding this claim). The time frame for Anderson to file a grievance about any of the events that underly his claims in this case was 60

days from discovering "the incident, occurrence or problem that [gave] rise to the grievance." Ill. Admin. Code tit. 20, § 504.810(a). At summary judgment, Defendants bear the burden of showing "beyond dispute" that administrative remedies were available. *Ramirez*, 906 F.3d at 533–34.

Defendants have satisfied their burden. All the alleged actions or inactions that give rise to Anderson's claims in this case occurred between December 2018, when Dr. Sood allegedly saw Anderson about his suspected allergy to the Meal Mart shelf-stable meals (3AC ¶¶ 49–51), and early May 2021, when Clark and Meaker allegedly became aware of Anderson's allergic reactions to the meals yet did nothing to address them. (*Id.* ¶¶ 104–07.) Anderson, in turn, admits that he filed numerous grievances between January 2018 and his discharge in December 2021—a nearly four-year period that encompasses all of Defendants' alleged misconduct, as well as the subsequent 60-day periods for filing grievances about this misconduct. (Dkt. No. 136-1 at 2–4 (Pl. Resps. to Williams RFA Nos. 1, 2, 4).) Anderson regularly took advantage of IDOC's grievance process, filing twenty-two grievances between October 2018 and November 2021. (Pl. Resp. to IDOC SOF ¶¶ 22, 30, 31; Pl. Resp. to Sood Suppl. SOF ¶¶ 2, 4, 6, 8, 10, 12, 14, 16, 18, 19, 21, 23, 25, 27, 29, 32; Dkt. No. 136-1 at 3–6, 9–12, 14 (Pl. Resps. to Williams RFA Nos. 1, 5, 7–9, 11, 20–22, 24, 25, 30, 31, 36); Dkt. No. 136-2.) What is more, Anderson failed to identify any dates during which he did *not* have access to grievance forms, even though he was specifically asked to do so during supplemental discovery. (Dkt. No. 136-1 at 17 (Pl. Resp. to Williams Interrog. No. 1); *see also id.* at 4 (Pl. Resp. to Williams RFA No. 4) (asserting that sometimes it could take weeks to secure a meeting with a counselor before filing a grievance at JTC but failing to identity any time frames when this occurred).) Accordingly, Defendants have demonstrated that administrative remedies were available for Anderson to timely exhaust before

he filed suit against Dr. Larry and Dr. Williams in February 2021 and Dr. Conway, Dr. Sood, Nurse, Clark, and Meaker in May 2021.

Anderson does not dispute that he had the ability to timely file grievances to address each Defendant's alleged misconduct, but he contends that any grievances he would have filed after the April 2019 Grievance "would have been rejected as duplicative and thus futile." (Pl. Suppl. Br. at 2.) To support this contention, he cites the two grievances he filed on May 31, 2021—a grievance regarding his allergic reaction to the shelf-stable kosher meals, and another grievance complaining that his meals violated kosher laws because they were not prepared in a properly maintained kosher kitchen—and the fact that IDOC denied the allergic reaction grievance as duplicative of the other grievance. (*Id.* at 2–3; Dkt. No. 141-7 (exhibit containing both May 31 grievances and the prison's responses).) This denial, according to Anderson, shows that further complaints about his allergic reaction "would have been futile and no further administrative remedy would be available to him because his complaints were deemed duplicative." (Pl. Suppl. Br. at 3.)

Anderson's argument comes up short for several reasons. First, Anderson's assertion of futility is supported only by attorney argument; he does not cite to any evidence, such as a declaration or interrogatory response, suggesting that Illinois River's handling of the May 31, 2021 grievances caused him to believe that filing additional grievances regarding his allergic reactions would have been futile. (*See id.* at 2–3.) This assertion therefore cannot stave off summary judgment. *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 361 (7th Cir. 1992) ("Argument is not evidence upon which to base a denial of summary judgment."). Second, even if Anderson believed that filing additional grievances after May 2021 would have been futile based on Illinois River's actions, this belief has nothing to do with the availability of

16

administrative remedies at JTC, where Anderson was housed before being transferred to Illinois River in April 2021. Finally, it is well-established that the futility or perceived futility of a prison's administrative process does not excuse a prisoner from following that process. *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) (refusing to recognize a futility exception for the PLRA's exhaustion requirement); *Obriecht v. Raemisch*, 517 F.3d 489, 492 (7th Cir. 2008) ("Exhaustion is required even if the prisoner believes his efforts in securing relief will be futile[.]"). As the Seventh Circuit recently explained, "if the prison administrative authorities can take *some* action—even if it's not the requested action and even if the prisoner believes that exhaustion will be futile—administrative remedies are available, and the prisoner must exhaust them." *Williams v. Rajoli*, 44 F.4th 1041, 1045 (7th Cir. 2022) (quotation marks omitted). Thus, even if Anderson believed that filing grievances after May 2021 would be futile, this belief did not make the prisons' administrative remedies any less available to him.

Anderson also contends that his "medical condition and complaints were being ignored, delayed, or pushed off repeatedly." (Pl. Suppl. Br. at 3–4.) He points out that he was not given an allergy test until after he filed this lawsuit and that Dr. Larry did not issue a determination on the April 2019 Grievance until December 2020. (*Id.* at 4.) But Anderson's failure to obtain the specific relief he wanted (an allergy test) before bringing suit did not make the prisons' administrative remedies unavailable. *See Williams*, 44 F.4th at 1045; *Fencel v. Cross*, 857 F. App'x 869, 870 (7th Cir. 2021) ("[I]f a prison can take some action in response to a grievance— even if not the specific relief requested—a remedy is available under § 1997e(a)."). As for Dr. Larry's failure to review the April 2019 Grievance until December 2020, we agree that the twenty-month delay is lengthy, but Anderson provides no legal authority suggesting that it is so egregious as to render the process for the April 2019 Grievance (or any other grievance)

unavailable. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). To the contrary, by repeatedly asserting that he fully exhausted the April 2019 Grievance (Pl. Opp'n at 1, 6–8, 11; Pl. Suppl. Br. at 1), Anderson implicitly concedes that the administrative process for that grievance was in fact available.

Because Defendants have shown that administrative remedies were available to Anderson, we next consider whether Defendants have demonstrated that Anderson failed to properly exhaust these remedies.

## II.    Did Anderson Properly Exhaust His Administrative Remedies?

The PLRA "requires 'proper exhaustion'; that is, the inmate must file a timely grievance utilizing the procedures and rules of the state's prison grievance process." *Maddox*, 655 F.3d at 720. Although the Seventh Circuit has "taken a strict compliance approach to exhaustion," *id.* at 721 (quotation marks omitted), we remain mindful that Anderson need not prove that he properly exhausted his administrative remedies; rather, Defendants must show that Anderson did *not* properly exhaust his remedies. *Jones v. Pfister*, No. 17 C 8789, 2021 WL 1020996, at *6 (N.D. Ill. Mar. 17, 2021).

### A.    The IDOC Defendants

We begin with the IDOC Defendants' arguments. They contend that Anderson failed to properly exhaust his administrative remedies against them for two reasons: (1) the October 2018 and April 2019 Grievances do not name or describe any of the IDOC Defendants or specify their alleged misconduct, as prison regulations require; and (2) Anderson filed the grievances before any of the IDOC Defendants engaged in their alleged misconduct. (IDOC Mem. at 4–10.) In addition, Meaker and Clark separately argue that because they did not become involved in the

alleged misconduct until after this lawsuit was filed in February 2021, Anderson did not, as a matter of law, complete the exhaustion process against them. (*Id.* at 8–9.)

### 1.    Failure to Comply with Prison Regulations

The IDOC Defendants first assert that Anderson did not properly exhaust his remedies because his grievances did not comply with prison regulations. To properly exhaust administrative remedies, a prisoner must comply with the prison's grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Illinois prisons require an inmate's grievance to "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint." Ill. Admin. Code tit. 20, § 504.810(c). If an inmate does not know the names of the individuals involved, he can still file a grievance so long as he "include[s] as much descriptive information about the individual[s] as possible." *Id.*

Anderson's October 2018 and April 2019 Grievances, which he submitted while housed at JTC, do not name or describe any of the IDOC Defendants. (Pl. Resp. to IDOC SOF ¶ 24.) Nor do they list any specific wrongdoing committed by any of these defendants. (*Id.* ¶ 25.) According to the IDOC Defendants, these omissions mean that Anderson's grievances failed to comply with § 504.810(c) of the Illinois Administrative Code, which is "fatal" to his claims against them. (IDOC Mem. at 4–8.)

We disagree. Section 504.810(c) requires a prisoner to name or describe "each person who is the subject of or who is otherwise involved in the complaint" being made. Ill. Admin. Code tit. 20, § 504.810(c). But the IDOC Defendants could not have been the subject of the complaints Anderson made in October 2018 and April 2019, as none of them were working in a

relevant capacity at JTC (if at all) at those times.[4]  This undisputed fact may bear on whether the

October 2018 and April 2019 Grievances fail to exhaust Anderson's claims for other reasons (as

discussed below), but it does not make the grievances non-compliant with § 504.810(c).  In other

words, we do not read § 504.810(c) as requiring a prisoner to peer into the future to describe

wrongdoing that has not yet occurred and name the individuals who will commit that

wrongdoing, which is essentially what the IDOC Defendants' reading of § 504.810(c) would

require.  *Cf. Lewis v. Pfister*, No. 18 CV 4502, 2019 WL 5577164, at *3–4 (N.D. Ill. Oct. 29,

2019) (finding that the plaintiff did not have to do the impossible and grieve his allegedly poor

medical care before he received that care).

        Moreover, even if the October 2018 and April 2019 Grievances' failure to identify any

IDOC Defendant did somehow violate § 504.810(c), the violation would not be fatal.  A

grievance's failure to name or describe a defendant as required by § 504.810(c) amounts to a

"mere technical defect" if the prison does not reject the grievance based on that failure.  *Maddox*,

655 F.3d at 721–22.  "Where prison officials address an inmate's grievance on the merits without

rejecting it on procedural grounds, the grievance has served its function of alerting the state and

inviting corrective action, and defendants cannot rely on the failure to exhaust defense."  *Id.* at

722.  Here, the prison administration did not deny either of Anderson's grievances because it

failed to comply with § 504.810(c).  The October 2018 Grievance was denied by both the

grievance officer and the ARB on the basis that the prison administration had properly addressed

the issue.  (Pl. Resp. to Sood SOF ¶¶ 7, 9; Dkt. Nos. 115-4, 115-5.)  As for the April 2019

---

[4] Dr. Conway did not begin working for IDOC until September 2019, Nurse did not begin
supervising and overseeing JTC's dietary unit until January 2020, and Dr. Williams and Dr.
Larry did not join JTC until January 2020 and February 2020, respectively.  (Pl. Resp. to IDOC
SOF ¶¶ 3, 6, 7, 9–14; Conway Decl. ¶¶ 3, 4.)  And there is no evidence that Clark and Meaker
ever worked at JTC.

Grievance, the grievance officer indicated that he was waiting for more information before making a decision, and the ARB denied Anderson's appeal on timeliness grounds. (Pl. Resp. to Sood SOF ¶¶ 12, 15; Dkt. Nos. 115-7, 115-8.) Although the ARB's decision was based on a procedural deficiency, it was not the alleged procedural deficiency that the IDOC Defendants now raise. *See Maddox*, 655 F.3d at 722 ("[A] procedural shortcoming . . . amounts to a failure to exhaust only if prison administrators explicitly relied on *that shortcoming*." (alteration in original) (emphasis added) (quotation marks omitted)). Thus, the grievances' failure to name or describe the IDOC Defendants alone does not mean that Anderson failed to exhaust his remedies against them.[5] *See id.* at 721–22; *Boyd v. Pfister*, No. 18-cv-03275, 2020 WL 6381367, at *8–9 (N.D. Ill. Oct. 30, 2020) (the plaintiff's failure to name the defendants in his grievance did not constitute a failure to exhaust where the prison did not reject the grievance on those grounds); *Lewis*, 2019 WL 5577164, at *3 (same).

### 2. Filing a Grievance Before a Defendant's Involvement

That brings us to the IDOC Defendants' second argument: that because none of the IDOC Defendants became involved in the events underlying Anderson's lawsuit until *after* Anderson filed the October 2018 and April 2019 Grievances, these grievances cannot exhaust his claims

---

[5] The Seventh Circuit's decisions in *Roberts v. Neal*, 745 F.3d 232 (7th Cir. 2014) and *Barrow v. Wexford Health Sources, Inc.*, 793 F. App'x 420 (7th Cir. 2019), cited by the IDOC Defendants (IDOC Mem. at 5, 8), do not require a contrary result. In both decisions, the Seventh Circuit suggested that a grievance's failure to name or describe the defendant alone precluded the grievance from exhausting the plaintiff's administrative remedies with respect to that defendant. *Roberts*, 745 F.3d at 234–36; *Barrow*, 793 F. App'x at 423. But *Maddox*, which issued before *Roberts* and *Barrow*, requires us to consider whether the prison administration rejected the grievance on this basis; if not, the alleged procedural shortcoming does not provide a basis to find a failure to exhaust. *See Maddox*, 655 F.3d at 721–22. Because neither *Roberts* nor *Barrow* acknowledged *Maddox* or was circulated to the full court under Circuit Rule 40(e), neither case can alter this requirement. *See Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002). Moreover, *Barrow* is an unsigned, non-precedential order, so it cannot set forth a binding rule contrary to *Maddox* (a precedential decision) for this reason as well. *See* 7th Cir. R. 32.1(b).

against any of them. (IDOC Mem. at 6–9; IDOC Reply at 12–13.) It is undisputed that none of the IDOC Defendants could have been responsible for providing Anderson with meals or medical care when he filed the October 2018 and April 2019 Grievances. Dr. Conway did not begin working for IDOC until September 2019; Nurse did not begin supervising and overseeing JTC's dietary unit until January 2020; Dr. Williams and Dr. Larry did not begin working at JTC until January 2020 and February 2020, respectively; and Anderson was not transferred to Illinois River, where Clark and Meaker work, until April 2021. (Pl. Resp. to IDOC SOF ¶¶ 3–7, 9–14, 19, 20; Conway Decl. ¶¶ 3, 4.) Thus, the question becomes whether the October 2018 and April 2019 Grievances, which were submitted before any IDOC Defendant allegedly engaged in misconduct, exhaust Anderson's claims based on that misconduct.

Anderson argues that they do under the continuing violation doctrine set forth in *Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013). (Pl. Opp'n at 10.) According to Anderson, this doctrine means that he did not need to "continually file grievances about an ongoing violation every time a new employee began working for IDOC or every time IDOC shuffled him to a new facility." (*Id.* at 9.) Relying upon *Turley*, Anderson contends that the October 2018 and April 2019 Grievances, which he filed while at JTC, exhausted his claims against both the IDOC Defendants who work at JTC (the "JTC Defendants") and the IDOC Defendants who work at Illinois River (the "Illinois River Defendants"). We address each group of defendants separately.

### a. The JTC Defendants

We start with the JTC Defendants: Dr. Larry, Dr. Williams, Dr. Conway, and Nurse. Anderson alleges that Dr. Larry, Dr. Williams, and Nurse knew that he could not eat the Meal Mart shelf-stable kosher meals and failed to provide him with a nutritionally sufficient kosher diet that he could safely consume, thereby violating his rights under RLUIPA, the First Amendment, and the Eighth Amendment. (3AC ¶¶ 70–72, 79–82, 113–37.) Anderson further

alleges that Dr. Williams did not take any steps to have him medically evaluated for an allergy despite knowing in late 2020 that Anderson had been denied an allergy test. (*Id.* ¶¶ 72–75.) Dr. Conway, for her part, allegedly exhibited deliberate indifference to Anderson's suspected allergic reactions in violation of the Eighth Amendment by failing to order an allergy test for Anderson in September 2020. (*Id.* ¶¶ 66–69, 138–44.)

As already noted, the October 2018 and April 2019 Grievances precede the JTC Defendants' alleged misconduct, and grievances generally "cannot exhaust administrative remedies for actions that happen after they are filed." *Todd v. Shaw*, No. 3:17-cv-359-DRH-DGW, 2018 WL 5904455, at *4 (S.D. Ill. Aug. 27, 2018), *report and recommendation adopted by* 2018 WL 4679961 (S.D. Ill. Sept. 27, 2018). In *Turley*, however, the Seventh Circuit recognized an exception to this general rule. The plaintiff in *Turley* was an inmate at a prison that imposed 25 lockdowns between January 2008 and October 2010. 729 F.3d at 648. In February 2009, the plaintiff filed a grievance challenging the prison's frequent use of lockdowns, and he later filed suit, alleging that the lockdowns violated his Eighth Amendment rights. *Id.* at 648–49. In examining whether the plaintiff had properly exhausted his administrative remedies for his Eighth Amendment claim, the *Turley* court explained that "[s]eparate complaints about particular incidents are only required if the underlying facts or the complaints are different." *Id.* at 650. If a prisoner's "objectionable condition is continuing," however, the prisoner "need not file multiple, successive grievances raising the same issue (such as prison conditions or policies)" to exhaust his remedies. *Id.* The *Turley* court then found that the prisoner's February 2009 grievance exhausted his claim challenging the prison's lockdown policy, even though the prisoner's claim included allegations of lockdowns that did not occur until after the grievance was submitted. *Id.* at 648, 650. Because the grievance "centered around continuing prison

policies," the court explained, one grievance "was sufficient to give the prison a chance to correct the problems." *Id.* at 650.

*Turley* did not address the precise question here, *i.e.*, whether a grievance can exhaust a prisoner's claim against a defendant in litigation where the claim is based *solely* on actions the defendant undertook after the grievance was filed, as the lockdowns in *Turley* occurred both before and after the relevant grievance. *See id.* at 648. Nonetheless, district courts have relied upon *Turley* to find that filing a grievance at a prison before a defendant commits any alleged wrongdoing at the same prison can exhaust the prisoner's claim against that defendant.

In *Owens v. Duncan*, for instance, the plaintiff asserted a deliberate indifference claim against a nurse (Dowty) based on her alleged failure to provide him with medication. No. 15-cv-1169-MJR-SCW, 2017 WL 895591, at *1–2 (S.D. Ill. Mar. 7, 2017). Dowty moved for summary judgment, arguing that the plaintiff failed to exhaust his administrative remedies against her. *Id.* at *1. The district court disagreed; it held that a grievance asserting that the plaintiff was not receiving medication exhausted his claim against Dowty, even though the plaintiff filed the grievance ten days *before* Dowty's alleged failure to provide him with medication. *Id.* at *1–2, *6. Relying upon *Turley*, the *Owens* court explained that because the plaintiff's failure to receive medication was an ongoing problem to which Dowty contributed, the plaintiff did not need to file a separate grievance after Dowty's alleged misconduct to grieve his claim against her. *Id.* at *6.

Similarly, the district court in *Todd* found that a grievance submitted before the defendant even began working at the prison exhausted the plaintiff's claim against him. In *Todd*, the plaintiff alleged that a defendant (Blum) showed deliberate indifference to his serious medical needs by failing to address his diabetes. 2018 WL 5904455, at *1. Blum argued at summary

judgment that the relevant grievances could not exhaust the plaintiff's claim against him because he did not begin working at the prison until after the grievances were filed. *Id.* at *4. The magistrate judge disagreed, reasoning that the plaintiff's grievances exhausted his claim against Blum because they "complain[ed] of an unresolved continuing violation"—the failure to provide food to control the plaintiff's diabetes—"that encompass[ed] Blum's alleged inaction." *Id.* at *5. Moreover, the plaintiff's claim against Blum was not based on "specific treatment provided by Blum," but on a "general policy or practice of failing to provide medically necessary meals[.]" *Id.* Accordingly, requiring the plaintiff to file another grievance once Blum began working at the prison would run contrary to *Turley*, which held "that prisoners do not need to file multiple grievances where a continuing violation exists." *Id.* (citing *Turley*, 729 F.3d at 650).

Owens and Todd support the conclusion that a grievance filed before a defendant allegedly commits any misconduct can exhaust a claim against that defendant—at least when the defendant's misconduct occurs at the same prison where the prisoner filed his grievance. In that situation, a grievance can exhaust a claim that is based on the defendant's later actions under *Turley*'s continuing violation doctrine if two requirements are satisfied. First, the grievance must complain of a continuing objectionable condition. *See Turley*, 729 F.3d at 650; *see also Burt v. Berner*, No. 13-CV-794-NJR-DGW, 2015 WL 1740044, at *3 (S.D. Ill. Apr. 14, 2015) (explaining "that a previously submitted grievance will suffice to exhaust remedies for future events only if the prisoner remained in the same situation"). Second, this continuing objectionable condition must form the basis of the plaintiff's claim against the defendant in litigation. *See Henderson v. Jess*, No. 21-1585, 2022 WL 1831133, at *3 (7th Cir. June 3, 2022) ("[F]or the continuous-violation doctrine to apply, the grievances on file must afford the prison notice of the precise claim at issue in the later lawsuit." (citing *Turley*, 729 F.3d at 650)); *Venson*

25

*v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 2948817, at *8–9 (S.D. Ill. July 14, 2021) (two grievances that predated the defendants' misconduct could not exhaust the plaintiff's claim against them under the continuing violation doctrine because the grievances complained of conduct that was "of a different flavor" and "factually distinct" from the alleged misconduct underlying the claim); *Smith v. Martin*, No. 14-cv-429-wmc, 2016 WL 3830565, at *5 (W.D. Wis. July 12, 2016) ("[A] grievance will suffice to exhaust remedies for an ongoing issue only if the grievance actually related to the actions, policies, or procedures at issue in the case.").

It is the JTC Defendants' burden to demonstrate in their summary judgment briefing that neither the October 2018 Grievance nor the April 2019 Grievance properly exhausted Anderson's claims against them. *See Beardsall*, 953 F.3d at 972 ("[T]he movant bears the burden of showing that summary judgment is appropriate[.]"); *Jones*, 2021 WL 1020996, at *6 ("[T]he defendant bears the burden to show that an inmate did not properly exhaust available remedies."). Based on Anderson's invocation of *Turley*'s continuing violation doctrine and the foregoing discussion, that means that the JTC Defendants must show, for each grievance, either (1) that the grievance does not identify a continuing objectionable condition, or (2) that the issues identified by the grievance do not form the basis of Anderson's claims against them in this case.

The JTC Defendants have not met their burden. First, the JTC Defendants do not analyze whether the issues raised in either the October 2018 Grievance or the April 2019 Grievance identify a continuing objectionable condition. Rather, they broadly contend that Anderson's "kosher meal issue" was not an ongoing violation because "the provision of meals at each facility, as well as the involvement of Defendants, who held *different positions at different IDOC facilities*, were distinct." (IDOC Mem. at 9–10 (emphasis in original); IDOC Reply at 12

(same).)[6] But this contention is unpersuasive, at least as it relates to the JTC Defendants. The JTC Defendants did not work at different facilities; they all worked at the same IDOC facility where Anderson filed the grievances at issue. Moreover, the JTC Defendants do not direct us to any authority indicating that the mere fact that they held different positions precludes their alleged misconduct from contributing to the same ongoing violation. The applicability of the continuing violation doctrine depends on the nature of the complained-of violation, not the titles of the employees who allegedly contributed to the violation. And as alleged in the operative complaint, the "kosher meal issue," as the IDOC Defendants put it, was a continuing condition at JTC—one that lasted roughly two-and-a-half years, from October 2018 until Anderson was transferred to Illinois River in April 2021. (*See generally* 3AC ¶¶ 32–88.)

Second, the JTC Defendants make no attempt to explain how the issues identified in either grievance are "of a different flavor" and "factually distinct" from the alleged misconduct underlying Anderson's claims against them. *See Venson*, 2021 WL 2948817, at *8–9. The JTC Defendants instead seem to merely contend that a grievance filed before a defendant allegedly commits any misconduct cannot, as a matter of law, exhaust a claim against that defendant. (*See, e.g.*, IDOC Mem. at 10 ("Plaintiff cannot have exhausted his remedies against [the JTC Defendants] when the undisputed record shows that they could not have been involved at [the] time he filed his grievances."); IDOC Reply at 13 (same).) But the JTC Defendants do not cite any case law to support this contention, and we disagree with this contention as set forth above.

At bottom, the JTC Defendants' briefing does not do enough to show that they are entitled to summary judgment on their failure-to-exhaust defense. We therefore deny the JTC Defendants' request for summary judgment.

---

[6] Our focus in this section is on the JTC Defendants, so we refer to arguments from the IDOC Defendants' briefing as the JTC Defendants' arguments.

### b.     The Illinois River Defendants

We next turn to Anderson's claims against the Illinois River Defendants: Clark, Illinois River's day-to-day warden, and Meaker, Illinois River's Health Care Unit Administrator. These claims are based on events that allegedly took place in April or May 2021, while Anderson was housed at Illinois River. (*See, e.g.*, 3AC ¶¶ 88, 102–07.) Anderson argues that the October 2018 and April 2019 Grievances, which he submitted at JTC, exhaust these claims because his transfer from JTC to Illinois River did not "break the chain" of IDOC's ongoing constitutional violation. (Pl. Opp'n at 12–13.)

*Turley*'s continuing violation doctrine cannot be stretched so far. For one thing, *Turley* did not consider whether a grievance filed at one prison could exhaust claims that arise out of later events that occur at a *different* prison. *See* 729 F.3d at 748–50. Furthermore, *Turley* explained that "[s]eparate complaints about particular incidents are [] required if the underlying facts or the complaints are different." *Id.* at 750. The facts underlying Anderson's alleged mistreatment at Illinois River are necessarily different from the facts underlying his alleged mistreatment at JTC because these instances of mistreatment occurred at different prisons. *See Burt*, 2015 WL 1740044, at *4 (explaining that once the plaintiff was transferred to another prison, "he no longer remained in the same situation," and finding that a grievance about medical care he filed at the first prison did not exhaust claims based on medical care that occurred at the second prison). Finally, the prisoner in *Turley* exhausted his remedies because his grievance "was sufficient to give the prison a chance to correct the problems" at issue. 729 F.3d at 650. Indeed, the purpose of the exhaustion requirement is "to alert prison officials to perceived problems and [] enable them to take corrective action without first incurring the hassle and expense of litigation." *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005). But we do not see how grievances filed at JTC in October 2018 and April 2019 could have alerted prison

administrators *at Illinois River* about the issues Anderson had with their prison more than two

years later.  *See Venson*, 2021 WL 2948817, at *8 (grievances filed at one prison could not have

put officials at a second prison "on notice that [the prisoner] was allegedly being mistreated at

their facility or given them any opportunity to investigate or correct the problem"); *Burt*, 2015

WL 1740044, at *4 (grievance about the denial of medical care at one prison could not have put

officials at a second prison "on notice that [the prisoner] was allegedly receiving inadequate

medical care at their facility").  In sum, Anderson cannot rely upon *Turley*'s continuing violation

doctrine to grieve his claims against the Illinois River Defendants.

Anderson relies upon a district court case, *Youngblood v. Illinois Department of

Corrections*, to argue otherwise.  (*See* Pl. Opp'n at 12–13.)  In *Youngblood*, the magistrate judge

recommended denying a defendant's summary judgment motion for failure to exhaust after

concluding that a grievance submitted at one prison exhausted claims encompassing events that

later occurred at another prison.  *Youngblood v. Ill. Dep't of Corrs.*, No. 17-cv-807-DRH-SCW,

2018 WL 4403302, at *1–2, *4–5 (S.D. Ill. Aug. 6, 2018), *report and recommendation adopted

by* 2018 WL 4090990 (S.D. Ill. Aug. 28, 2018).  Relying upon *Turley*, the magistrate judge

explained that the plaintiff was not required "to re-grieve his same continuing complaint . . .

every time he is treated by a new medical provider, *or transferred to a new institution*, because

the facts and issues underlying [his] grievances are the same."  *Id.* at *5 (emphasis added).  The

moving defendant objected, arguing that *Turley* was inapplicable because the entire series of

relevant events in *Turley* occurred at the same prison.  2018 WL 4090990, at *3.  The district

court disagreed and adopted the magistrate judge's recommendation, reasoning that the

plaintiff's grievance was sufficient because it presented "general allegations of inadequate

medical care that continued after his transfer" to the second prison.  *Id.*  The district court also

noted that the plaintiff notified personnel at the second prison of the continuing medical condition that was outlined in his grievance. *Id.*

We do not find the *Youngblood* decisions persuasive. Both decisions fail to explain how medical care rendered at a different prison from where a grievance is submitted can arise out of the same set of underlying facts as the grievance. Nor does either decision consider whether a grievance complaining about an issue at one prison can alert officials at a second prison that the same issue exists at the second prison. And the fact that the plaintiff in *Youngblood* notified personnel at the second prison about his condition—presumably without using the prison's grievance procedures—does not retroactively make the prior grievance adequate. *Cf. Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011) ("A remedy is not exhausted if the prisoner has failed to abide by the procedures for pursuing relief."). *Youngblood* does not justify applying *Turley*'s continuing violation doctrine to the facts here.

Anderson also contends that the Illinois River Defendants knew about the issues at the prison because he told Illinois River's prior warden about them and sent letters to other Illinois River employees, including Meaker. (*See* Pl. Opp'n at 13.) Even if this is true, however, it is insufficient. A prisoner must comply with the prison's grievance procedures to properly exhaust his remedies. *Jones*, 549 U.S. at 218. Illinois's procedures require a prisoner to follow a three-step grievance process that involves attempting to resolve the problem with a counselor, filing a written grievance with a grievance officer, and appealing to IDOC's director. *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 831–32 (7th Cir. 2020); *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). Anderson's conversation with the prior warden and his letters do not comply with this process, so they do not help Anderson exhaust his remedies. *See Tackett v. Jess*, 853 F. App'x 11, 14 (7th Cir. 2021) (letters to officials could not be substituted for the

prison's grievance process, which required formal complaints); *Scott v. Baldwin*, No. 3:19-cv-00528-GCS, 2020 WL 5500532, at *5 (S.D. Ill. Sept. 11, 2020) ("A letter does not take the place of following an institution's grievance procedures[.]").

Because the October 2018 and April 2019 Grievances do not exhaust Anderson's claims against the Illinois River Defendants under *Turley*'s continuing violation doctrine, we grant summary judgment in the Illinois River Defendants' favor.

B.     **Dr. Sood**

Finally, we must decide whether the October 2018 and April 2019 Grievances exhausted Anderson's claim against Dr. Sood.  The sole claim against Dr. Sood alleges that he was deliberately indifferent to Anderson's serious medical needs in violation of the Eighth Amendment.  (3AC ¶¶ 138–44.)  Specifically, Anderson alleges that after Dr. Sood saw him in December 2018 and became aware of his allergic reactions to the Meal Mart shelf-stable meals, Dr. Sood failed to order an allergy test to confirm the allergy or note in Anderson's file that he should receive a substitute for the Meal Mart shelf-stable meals.  (*Id.* ¶¶ 49–51.)  Rather, according to Anderson, Dr. Sood merely told him to stop eating the meals.  (*Id.* ¶ 51.)

Dr. Sood argues that the October 2018 and April 2019 Grievances did not exhaust Anderson's claim against him because neither grievance (1) refers to Dr. Sood or (2) suggests that Anderson was dissatisfied with any medical treatment he received from Dr. Sood.  (Sood Mot. at 2–3, 7–8.)  And because Anderson never complained about his conduct in either grievance, Dr. Sood continues, the grievances failed to alert him to his allegedly inadequate medical care.  (*Id.* at 7–8.)

As an initial matter, whether Anderson's grievances alerted *Dr. Sood* to an issue with his conduct is not the relevant question.  The purpose of a prisoner's grievance is not "to put an individual defendant on notice of a claim against him," but "to give prison administrators an

31

opportunity to address a shortcoming." *Glick v. Walker*, 385 F. App'x 579, 582 (7th Cir. 2010);

*Goings v. Baldwin*, No. 19 C 3102, 2021 WL 3800744, at *4 (N.D. Ill. Aug. 26, 2021). So, to

determine whether the October 2018 and April 2019 Grievances exhausted Anderson's claim

against Dr. Sood, we ask whether the grievances adequately notified prison administrators about

Anderson's issues with Dr. Sood's conduct. *See Schillinger v. Kiley*, 954 F.3d 990, 995–96 (7th

Cir. 2020) ("[A] prisoner satisfies the exhaustion requirement when he gives a prison 'notice of,

and an opportunity to correct, a problem.'" (quoting *Turley*, 729 F.3d at 650)).

They did not. Neither grievance says anything that would alert JTC's administration to

the alleged misconduct that underlies Anderson's claim against Dr. Sood: his alleged failure in

December 2018 to order an allergy test and properly note that Anderson should receive substitute

kosher meals. (*See* 3AC ¶¶ 49–51, 143, 144.) The October 2018 Grievance discusses

Anderson's allergy to the Meal Mart shelf-stable meals and his corresponding inability to

consume enough calories, but it does not mention a failure by medical personnel to order an

allergy test or to note that Anderson should receive a substitute kosher meal. (*See* Pl. Resp. to

Sood SOF ¶ 5; October 2018 Grievance.) Nor does the April 2019 Grievance; it informs prison

administrators that Anderson is allergic to the Meal Mart shelf-stable meals and that the Director

of Nursing incorrectly told the warden that Anderson had no documented symptoms to those

meals. (Pl. Resp. to Sood SOF ¶ 10; April 2019 Grievance.) Because these grievances do not

notify the prison of the alleged misconduct underlying Anderson's claim against Dr. Sood, they

are insufficient to exhaust this claim. *See Bowers v. Dart*, 1 F.4th 513, 517–18 (7th Cir. 2021)

(no exhaustion where the allegation in the prisoner's grievance was "substantively distinct from

the allegations" underlying his claims in litigation); *Schillinger*, 954 F.3d at 996 (no exhaustion

where the prisoner's grievance raised "entirely different problems" than those underlying his

claim in litigation); *Henderson*, 2022 WL 1831133, at *3–4 (finding that grievances objecting to limits on "personal" books did not exhaust a claim regarding the religious need for books and that grievances objecting to being taken off the Ramadan schedule did not exhaust claims regarding missing items and low-calorie counts from Ramadan meals).

Anderson does not argue that the October 2018 Grievance exhausts his claim against Dr. Sood; he instead contends that the April 2019 Grievance alone exhausts his claim because it refers to a doctor that he saw on December 17, 2018, and that doctor is Dr. Sood.  (Opp'n at 13–15.)  But even if Dr. Sood is the doctor identified in the April 2019 Grievance, the grievance refers to the doctor only in the context of explaining what the Director of Nursing overlooked in Anderson's medical records:

> Lastly, I had see[n] the doctor on December 17, 2018 pertaining to this issue.  His order was "to [avoid] the food which is allergic." See medical records, specifically dated December 17, 2018.
>
> I am sure the Director of Nursing somehow overlooked these records when he was compiling his report to Warden Tack.  I understand mistakes happen; however, the Director of Nursing should correct the misinformation given to Warden Tack.

(Pl. Resp. to Sood SOF ¶ 10; April 2019 Grievance at 2.)  This explanation, however, does not suggest any issue with the doctor's conduct, let alone complain about the doctor's failure to order an allergy test and properly document an allergy, which are the alleged failures that underlie Anderson's claim against Dr. Sood in this lawsuit.

Dr. Sood has demonstrated that the October 2018 and April 2019 Grievances did not exhaust Anderson's administrative remedies against him, so we grant his motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the IDOC Defendants' motion for summary judgment based on exhaustion (Dkt. No. 111) is granted in part and denied in part, and Dr. Sood's motion for summary judgment based on exhaustion (Dkt. No. 114) is granted. We dismiss Defendants Tiffanie Clark, Jennifer Meaker, and Dr. Kul B. Sood from this case without prejudice. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) (holding that all dismissals for failure to exhaust under 42 U.S.C. § 1997e(a) should be without prejudice). By January 5, 2023, the remaining parties shall file a joint report that (1) proposes new deadlines for fact discovery, expert discovery, and the filing of dispositive motions, and (2) addresses the effect, if any, that Anderson's release on parole has on his remaining claims and requests for relief. The status hearing set for December 15, 2022, is stricken and reset to February 23, 2023, at 10:30 a.m. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: December 1, 2022